[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Belton,* Slip Opinion No. 2016-Ohio-1581.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-1581

THE STATE OF OHIO, APPELLEE, *v.* BELTON, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Belton,* Slip Opinion No. 2016-Ohio-1581.]

*Criminal law—Aggravated murder—Death penalty—Capital defendant does not have a right to jury at sentencing phase of trial when right to have jury determine guilt has been waived—Appropriateness and proportionality of death penalty—Death penalty affirmed.*

(No. 2012-0902—Submitted January 26, 2016—Decided April 20, 2016.)

APPEAL from the Court of Common Pleas of Lucas County,

No. CR200802934.

_____

**KENNEDY, J.**

{¶ 1} In 2008, defendant-appellant, Anthony Belton, robbed a gas-station convenience store and murdered Matthew Dugan, the attendant working in the store. Belton entered a no-contest plea to charges of aggravated robbery and aggravated murder with capital specifications, and a three-judge panel sentenced him to death.

**{¶ 2}** Belton's appeal of right is now before us. For the reasons explained below, we reject each of Belton's propositions of law and affirm his convictions and death sentence.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Pretrial Background

**{¶ 3}** In August 2008, the state charged Belton with one count of aggravated murder, R.C. 2903.01(B) and (F), and two counts of aggravated robbery, R.C. 2911.01(A). The aggravated-murder charge carried two death specifications, R.C. 2929.04(A)(3) (murder to escape detection) and 2929.04(A)(7) (felony murder). In addition, all three counts carried a firearm specification, R.C. 2941.145.

**{¶ 4}** The trial was originally scheduled for March 2, 2009. However, the trial court granted several continuances so that the parties would have sufficient time to investigate, complete discovery, and consult experts.

**{¶ 5}** The trial was also delayed because the trial court devoted significant attention to three constitutional arguments raised by the defense. First, Belton's counsel filed a motion to suppress the statements Belton made to police on August 14, 2008. Second, Belton argued that R.C. 2929.03 and Crim.R. 11(C)(3) are unconstitutional because they do not allow a capital defendant to have a jury determine his or her sentence if the defendant enters a plea of guilty or no contest.[1] Finally, trial counsel sought discovery on a selective-prosecution claim. After briefing and oral argument, the trial court rejected Belton's claims and his discovery request.

---

[1] The trial court held five hearings on this issue, and the parties filed multiple briefs arguing their positions. Later, the court postponed trial to await an appellate court's ruling on the same issue in a different case. Belton also unsuccessfully attempted to file an interlocutory appeal of the trial court's ruling. *See State ex rel. Bates v. Court of Appeals for the Sixth Appellate Dist.*, 130 Ohio St.3d 326, 2011-Ohio-5456, 958 N.E.2d 162.

**{¶ 6}** In April 2012, Belton waived his right to a jury and entered a plea of no contest to all charges. The trial court convened a three-judge panel to conduct a plea hearing on April 2, 2012.

### B. Evidence Presented at the Plea Hearing

#### 1. The State's Evidence

#### a. The robbery and murder

**{¶ 7}** On August 13, 2008, 34-year-old Matthew Dugan was working the night shift at a BP carryout and service station located at the intersection of Secor and Dorr Streets in Toledo. Four store security cameras were operational during Dugan's shift.

**{¶ 8}** Security recordings show a man entering the carryout at 6:53 a.m.[2] The man, who was wearing a dark hooded jacket and appeared to be African-American, left the store when another customer entered. At 6:55 a.m., the man reentered the store, selected two bottled drinks from the cooler, and brought them to the checkout counter. At that point, another customer entered the store, and the man left again. Dugan helped the other customer, then returned the bottled drinks to the cooler.

**{¶ 9}** At 7:00 a.m., the man entered the store a third time. He again selected two drinks and walked to the counter. Dugan began to ring up the sale, then turned around to get something from the wall behind the counter. When Dugan turned back around, the man was pointing a handgun at him.

**{¶ 10}** The recording shows Dugan leap back, raising his hands. Dugan opened the register, removed bills from the drawer, and gave them to the man. Then Dugan retrieved some items from the wall behind the counter for the man. The man gestured toward something else behind Dugan, and Dugan turned around. The

---

[2] Detective Jeffrey Clark testified that the time stamp on the recording was approximately 50 minutes behind the actual time. This opinion refers to the actual time of events, not the incorrect times indicated by the time stamp.

man then leaned forward, raised the gun, and fired at the back of Dugan's head. Dugan fell to the floor, and the shooter left the store.

{¶ 11} Recordings indicate that several customers entered and left the carryout after Dugan was shot, apparently without noticing his body behind the counter. Customer Tiffany Greenlee testified that she intended to purchase coffee and a muffin from the carryout that morning, but she could not find an employee to ring up her sale. Greenlee set her items on the counter and left. On her way out, Greenlee looked into the store window and saw a man on the floor behind the counter, lying in a pool of blood. Greenlee called 9-1-1 at 7:40 a.m.

### b. Investigation

{¶ 12} Police quickly responded and secured the scene. Police identified the victim as Dugan. The owner of the carryout, Samuel Baiz, informed police that $600 and several prepaid phone cards were missing from the store.

{¶ 13} Detective William Goetz recovered a spent 9 mm shell casing near the cash register and a spent projectile two to three feet from Dugan's body. Police also photographed and collected paper money and coins that were lying on the checkout counter, along with two perspiring drink bottles, a muffin, and a bottled cappuccino. A printout from the cash register showed that the last transaction that morning was at 7:00 a.m.

{¶ 14} Detective Goetz reviewed the store's security recordings, and Detective Jeffrey Clark coordinated a canvass of the area. Clark testified that during the canvass, an employee at a nearby business gave him the name "Anthony Beltran" as a possible suspect.

{¶ 15} Clark returned to police headquarters, where he ran the name "Anthony Beltran" through a database. According to Clark, his search generated 11 names, including two African-American males. One of the two was Anthony Belton, whose last known address was 934 Cuthbert.

4

{¶ 16} Clark mentioned Belton's name to Detective Jason Lenhardt. Lenhardt told Clark that he knew Belton and had last seen him around 9:00 p.m. on August 12, 2008.  He also informed Clark that Belton had recently moved to 1018 Ranch, which was located one-half mile from the BP.  At the plea hearing, Lenhardt testified that on August 12, Belton had a Mohawk and was wearing a black hooded sweatshirt, gray cargo pants, and black sneakers (which matched the clothing worn by the perpetrator in the surveillance video).

{¶ 17} Clark obtained a search warrant for 1018 Ranch and executed the search with Lenhardt, Goetz, and other officers on the evening of August 13.  Police found three men at the location:  Belton, Dymon Bolton, and Christopher Wilson.  Belton and Bolton were inside a 1997 Buick that was parked in front of the house.  Lenhardt noted that Belton was still wearing gray cargo pants and black sneakers, but he was wearing a black t-shirt instead of the sweatshirt and his Mohawk had been shaved.

{¶ 18} Detective Schriefer collected fingerprints from the Buick, and at Belton's request, Detective Lenhardt retrieved two pairs of new sneakers (and corresponding receipts) from the car.  Lenhardt also seized two black hooded sweatshirts that were on top of a car parked in the driveway of 1018 Ranch.

{¶ 19} Officers took Belton, Bolton, and Wilson into custody and took them to headquarters.

### c. Belton's interrogation and arrest

{¶ 20} Detectives Clark and Kermit Quinn interviewed Belton twice on August 14; the first interview began at 12:50 a.m.  After executing a written waiver of his *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Belton provided several conflicting accounts of the events of August 13.  The state introduced video recordings of Belton's interviews at the plea hearing.

**{¶ 21}** In response to police questioning, Belton initially denied involvement in the robbery or murder. He told detectives that he had shaved his Mohawk the night before because he lost a bet. Belton said that he had spent the night at his brothers' apartment. Around 9:30 a.m., he went to his own neighborhood to try to sell some drugs because he needed money. Belton noticed that there were a lot of police around, so he stopped by his mother's house, and she told him about the murder. Later, Belton went to Burger King and then the mall, where he bought sneakers.

**{¶ 22}** After further questioning, Belton admitted some involvement in the robbery. According to Belton, he was driving around with a man named "D," who suggested that Belton rob someone. D gave Belton a gun to use and Belton entered the BP twice. Each time, he picked up two sodas, but then left the store because customers came in and Belton was concerned that he might get caught. But Belton denied entering the store a third time. Instead, he said that D had entered the store, wearing a black hoodie, while Belton and Bolton waited in the car. After Belton heard a pop, he drove down the street to pick up D. D reported that he had shot the clerk in the back. The men went to Belton's brothers' apartment, where they counted and divided the money. Belton's share was $170.

**{¶ 23}** Finally, Belton admitted that he had shot the clerk. Belton said that he did not mean to kill Dugan, but "the gun went off" when he "went to put the safety on." At this point in the interview, Belton agreed to help Detectives Clark and Quinn find the firearm.

**{¶ 24}** Officers Lenhardt and Ruben Jurva transported Belton to 1018 Ranch around 3:00 or 4:00 a.m. Officer Jurva located a Hi-Point 9 mm handgun under a log in the yard. The firearm had three live cartridges in the magazine and one in the chamber. The grip on the gun was broken, and police were unable to locate the missing pieces.

{¶ 25} After returning to the station, Detectives Quinn and Clark interviewed Belton a second time, beginning at 5:34 a.m. Before questioning began, Clark reminded Belton of his *Miranda* rights.

{¶ 26} During this interview, Belton admitted that he had owned the gun for about a month but claimed that he did not know it was loaded. With respect to the shooting, Belton insisted that he had only clicked the safety button on the weapon, but he had not pulled the trigger. He said that he regretted everything and that he was sorry he had killed Dugan. Belton also clarified that Wilson was not involved in the robbery. According to Belton, his cousin "TT"—later identified as Tony Bivens—drove him and Bolton to and from the BP. TT also drove Belton and Bolton to the mall later to buy shoes.

{¶ 27} At this point, detectives arrested Belton and searched him. Clark recovered $147 cash and ten Page Plus prepaid phone cards, with a total value of $130. (During the interviews, Belton had admitted to owning a prepaid Page Plus cell phone.) Police also seized Belton's clothing: a black t-shirt, gray pants, and black and gray Adidas tennis shoes.

### d. Additional inculpatory statements

{¶ 28} Sergeant Corey Russell testified that Belton made additional inculpatory statements while he was in a holding cell at police headquarters on August 14, 2008. Russell was working at a desk near the cells where Belton, Bolton, and Wilson were being detained. According to Russell, he could easily overhear conversations between the men, who were in separate cells.

{¶ 29} Russell testified that while Bolton was being interviewed elsewhere, Belton made numerous statements to Wilson. According to Russell, Belton told Wilson that Bolton had "given him up." Belton then asserted that Bolton had told the officers "everything said in the car * * * word for word"; he asked Wilson to let everyone know that Bolton "couldn't keep his mouth shut." Ultimately, Russell

said, Belton indicated that *he* was responsible and that he did not understand why officers were still holding Wilson.

### e. Forensic evidence

{¶ 30} Dr. Diane Scala-Barnett, a Lucas County deputy coroner, performed an autopsy on Dugan's body. Scala-Barnett testified that Dugan died of a single gunshot wound to the back of the head and classified the death as a homicide. Based on stippling around the entrance wound, she opined that the gun had been fired 12 to 24 inches from Dugan's head. Moreover, after being shown the video of the shooting, Scala-Barnett was asked how the shooter had gotten so close to Dugan considering the size of the counter, and she said that the shooter had leaned forward across the counter to fire at close range. Finally, Scala-Barnett noted that the gunshot did not instantly kill Dugan.

{¶ 31} The state introduced evidence showing that the fingerprints lifted from the driver's-side rear door of the Buick were Belton's, but DNA evidence was inconclusive. Finally, the state introduced evidence about the operability of the Hi-Point 9 mm handgun recovered at 1018 Ranch. The president of Hi-Point Firearms, Thomas Deeb, determined that the gun was functional and performed acceptably. The state also submitted ballistics reports from BCI analyst Todd Wharton, who concluded that the recovered Hi-Point 9 mm handgun fired the cartridge found at the crime scene. In one report, Wharton noted that the firearm's "safety lever can easily become disengaged by routine handling" because it was missing part of the right grip plate, hold-open spring, and magazine catch cover/button. Even so, Wharton opined that the gun's trigger could not be pulled while the safety was engaged. Wharton stated that someone would have to exert 5.25 pounds of pressure on the trigger to fire the weapon.

### *2. Belton's Evidence*

{¶ 32} Belton submitted two exhibits in his defense: a curriculum vitae for John Nixon, a firearms expert with Athena Research and Consulting, L.L.C., and Nixon's report.

{¶ 33} Nixon's report described his analysis of the Hi-Point 9 mm handgun and opined that it was in average condition. He noted that "[t]he safety lever was unusually easy to operate," but nevertheless concluded that the pistol would not fire if the safety was on. Nixon's report also states that the weapon did not fire when he tapped it on his lab bench in a variety of positions, though he noted that "more violent testing may well have resulted in accidental discharge."

{¶ 34} Nixon test-fired the gun 28 times and concluded that it required 3.384 to 5.733 pounds of force to pull the trigger. He did note that on the tenth test, the peak force and distance the trigger moved were significantly less than normal for the pistol. According to Nixon, the "practical effect" of this aberration would be "to surprise the shooter, and possibly result in an unintentional discharge of the pistol."

### C. Verdict and Sentencing

{¶ 35} The three-judge panel found Belton guilty of the charged offenses.

{¶ 36} Before sentencing, the trial court merged the two capital specifications, the two aggravated-robbery counts, and the three firearm specifications. The state elected to proceed on the felony-murder specification, R.C. 2929.04(A)(7). After a mitigation hearing, the panel sentenced Belton to death for the aggravated murder, ten years for the aggravated robbery, and three years for the firearm specification, to be served consecutively.

{¶ 37} Belton now appeals, raising 20 propositions of law. We will address Belton's propositions out of order for ease of analysis.

## II. ANALYSIS

### A. Constitutional Challenges to Ohio's Death-Penalty Laws

#### *1. Repeal of the Death Penalty*

**{¶ 38}** In proposition of law No. 2, Belton contends that his death sentence is unconstitutional because the 2011 amendment to R.C. 2929.11 "effectively repealed Ohio's death penalty."[3]

**{¶ 39}** R.C. Chapter 2929 addresses penalties and sentencing for criminal offenses. *See State v. Ford*, 128 Ohio St.3d 398, 2011-Ohio-765, 945 N.E.2d 498, ¶ 18. The specific provision at issue here is R.C. 2929.11(A), which articulates the overriding purposes of felony sentencing.

**{¶ 40}** From the time of its 1996 enactment until September 30, 2011, R.C. 2929.11(A) stated:

> A court that sentences an offender for a felony shall be guided by the overriding purposes of felony sentencing. The overriding purposes of felony sentencing are to protect the public from future crime by the offender and others and to punish the offender. To achieve those purposes, the sentencing court shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both.

Am.Sub.S.B. No. 2, 146 Ohio Laws, Part IV, 7136, 7457-7458.

**{¶ 41}** In 2011, the General Assembly enacted Am.Sub.H.B. 86, which modified the second purpose in R.C. 2929.11(A) as follows:

---

[3] Belton does not—nor could he—make a case that the General Assembly *expressly* repealed the death penalty. The specific statutory provisions governing the death penalty, R.C. 2929.03 and 2929.04, were first enacted in 1972. And although these statutes have been amended multiple times, they have not been repealed.

A court that sentences an offender for a felony shall be guided by the overriding purposes of felony sentencing. The overriding purposes of felony sentencing are to protect the public from future crime by the offender and others and to punish the offender *using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources*. To achieve those purposes, the sentencing court shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both.

(Emphasis added.)

{¶ 42} According to Belton, R.C. 2929.11, as amended, irreconcilably conflicts with R.C. 2929.03 and 2929.04. R.C. 2929.03 and 2929.04 expressly provide for the death penalty, but Belton says that a death sentence will never satisfy R.C. 2929.11(A)'s requirement that it be the minimum sanction necessary to protect the public and punish an offender *without* imposing additional burdens on government resources. According to Belton, a sentence of life without parole achieves the same goals as a death sentence at a fraction of the cost.

{¶ 43} Belton then urges the court to resolve this conflict in favor of amended R.C. 2929.11 because (1) it was enacted later and (2) it reflects the General Assembly's "manifest intent" to repeal the death penalty. *See* R.C. 1.51 (reconciling conflicts between general and specific statutory provisions) and 1.52 (harmonizing irreconcilable statutes).

{¶ 44} "[W]e have said many times [that] repeals by implication are not favored * * *." *Lucas Cty. Bd. of Commrs. v. Toledo*, 28 Ohio St.2d 214, 217, 277 N.E.2d 193 (1971). This "is understandable * * * since it may properly be assumed

that the General Assembly had knowledge of the prior legislation when the subsequent legislation was enacted, and had the General Assembly intended to nullify such prior legislation it would have done so, by means of an express repeal thereof." *Cincinnati v. Thomas Soft Ice Cream, Inc.*, 52 Ohio St.2d 76, 79, 369 N.E.2d 778 (1977). Accordingly, if "two affirmative statutes exist one is not to be construed to repeal the other by implication unless they can be reconciled by *no* mode of interpretation." (Emphasis added.) *In re Hesse,* 93 Ohio St. 230, 234, 112 N.E. 511 (1915); *see also Henrich v. Hoffman*, 148 Ohio St. 23, 26, 72 N.E.2d 458 (1947) (if "two statutes are susceptible to a reasonable construction so that neither will be nullified, it is the duty of the court to so interpret them").

{¶ 45} Here, Belton cannot establish an irreconcilable conflict between R.C. 2929.11 and the statutory provisions governing the death penalty. Belton cites studies documenting the expenses associated with the death penalty and asserts that capital cases are "astronomically more expensive" than comparable noncapital cases. But, as R.C. 2929.11 states, cost is not the only relevant factor in determining a sentence. A court must also consider the minimum penalty necessary to sufficiently punish an offender. And Belton's assertion that the death penalty serves *no* penological function not otherwise served by a sentence of life without parole is, at best, questionable. Indeed, Belton's own brief acknowledges that there is ongoing debate over whether death sentences have more of a deterrent effect on homicides than long-term prison sentences do.

{¶ 46} In some cases then, a sentencing court may determine that the death penalty *is*, in fact, "the minimum sanction[]" that will accomplish its purpose of "punish[ing] the offender." R.C. 2929.11(A). And the fact that the General Assembly has not expressly repealed R.C. 2929.03 and 2929.04 indicates its judgment that the death penalty may be appropriate in at least some aggravated-murder cases.

12

**{¶ 47}** Belton also asserts that the death penalty violates R.C. 2929.11(A) because "[d]eath does not rehabilitate" and under R.C. 2929.11(A), courts must consider rehabilitation when arriving at a sentence.[4]  But R.C. 2929.11(A) states that a sentencing court should consider *four* factors: the need to incapacitate an offender, deterrence, rehabilitation, and restitution.  Rehabilitation is only one of these considerations, and it is not dispositive of a court's sentencing determination.

**{¶ 48}** For these reasons, Belton has not met the heavy burden required to establish that the General Assembly implicitly repealed the death penalty in 2011.  And because each of the constitutional and international-law challenges asserted in Belton's second proposition of law is premised on Ohio's repeal of the death penalty, we reject proposition of law No. 2.

## 2. Pleas and Capital Sentencing

**{¶ 49}** Under Ohio law, a capital defendant who enters a plea of guilty or no contest waives his right to have a jury determine both his guilt and his sentence.  *See* R.C. 2945.06; Crim.R. 11(C)(3).  In proposition of law No. 3, Belton asserts several constitutional challenges to this statutory scheme.

### a. Pleading guilty or no contest to capital charges

**{¶ 50}** "A criminal defendant does not have a constitutional right to enter a guilty plea or to have it accepted by the court."  *State ex rel. Bates v. Court of Appeals for the Sixth Appellate Dist.*, 130 Ohio St.3d 326, 2011-Ohio-5456, 958 N.E.2d 162, ¶ 27, citing *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); *North Carolina v. Alford*, 400 U.S. 25, 38, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), fn. 11.  Likewise, "there is no absolute right to enter a no contest plea."  *State v. Jones*, 116 Ohio St.3d 211, 2007-Ohio-6093, 877 N.E.2d 677, fn. 2.  "Instead, state law governs the exercise of the ability to plead guilty,"

---

[4] Belton offers this argument as support for his claim that the General Assembly repealed the death penalty when it amended R.C. 2929.11(A) in 2011.  But rehabilitation was not added as part of the 2011 amendment.  Rehabilitation (and the other three factors mentioned) have all been included in R.C. 2929.11(A) since its initial enactment.

*Bates* at ¶ 28, and a defendant may plead no contest only with the consent of the court, *Jones* at fn. 2.

{¶ 51} The process for entering a plea of guilty or no contest to charges of aggravated murder and related capital specifications is set forth in R.C. 2945.06 and Crim.R. 11(C)(3). In most cases, a defendant's plea of no contest or guilty to a felony amounts to a waiver of trial, meaning that the state need not present evidence of guilt. *State v. Post*, 32 Ohio St.3d 380, 392, 513 N.E.2d 754 (1987). However, "more stringent procedures" apply when a trial court accepts a plea to capital charges. *State v. Green*, 81 Ohio St.3d 100, 103, 689 N.E.2d 556 (1998). In a capital case, a three-judge panel must examine witnesses, "hear any other evidence properly presented by the prosecution," and "unanimously determine whether the defendant is guilty beyond a reasonable doubt of aggravated murder or of a lesser offense." *Id*. at 104-105. If the three-judge panel determines that the defendant committed aggravated murder and one or more aggravating circumstances, then the panel must proceed to sentencing. *See* Crim.R. 11(C)(3).

{¶ 52} As in all capital cases, the sentencing process is governed by R.C. 2929.03 and 2929.04. The three-judge panel must hear the mitigating evidence presented by the defense and identify any factors that militate against a sentence of death. Then the panel must determine whether the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. R.C. 2929.03(D)(1). After the panel arrives at a sentencing determination, it must issue a written opinion describing both its weighing process and its sentence. R.C. 2929.03(F).

{¶ 53} Under this statutory scheme, then, when a capital defendant waives a jury and enters a no-contest plea, a three-judge panel determines both guilt and the appropriate sentence. "R.C. 2945.06 and Crim.R. 11(C)(3) contain no provisions permitting an accused charged with a capital offense to waive a jury, request that a three-judge panel determine guilt upon a plea of guilty, and then have a jury decide the penalty." *Bates*, 130 Ohio St.3d 326, 2011-Ohio-5456, 958

N.E.2d 162, at ¶ 29, citing *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 122-125. And trial courts are not at liberty to create a nonstatutory procedure to convene a jury for sentencing purposes. *See State ex rel. Mason v. Griffin*, 104 Ohio St.3d 279, 2004-Ohio-6384, 819 N.E.2d 644, ¶ 17 (granting a writ to prohibit a trial judge from creating a hybrid, nonstatutory procedure).

{¶ 54} In short, Ohio law does not permit a jury to sentence a capital defendant if the defendant has elected to enter a plea of guilty or no contest to capital charges.

### b. *Apprendi* and its progeny

{¶ 55} Belton argues that the above statutory scheme violates the Sixth Amendment to the United States Constitution. According to Belton, "even if a capital defendant enters a guilty plea to Aggravated Murder and the accompanying death specifications, he has a right to a jury trial to determine the existence of any mitigating factors and to determine whether the aggravating circumstance or circumstances to which he would plead guilty outweigh those factors by proof beyond a reasonable doubt."

{¶ 56} In support of his constitutional claim, Belton cites two United States Supreme Court decisions: *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In *Apprendi*, the Supreme Court held that "the Sixth Amendment does not permit a defendant to be 'expose[d] * * * to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone.' " (Emphasis and brackets sic.) *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 189, quoting *Apprendi* at 483. Thus, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi* at 490.

**{¶ 57}** Two years later, in *Ring*, the Supreme Court applied the *Apprendi* rule to invalidate Arizona's capital-sentencing scheme. Under Arizona's former scheme, "following a jury adjudication of a defendant's guilt of first-degree murder, the trial judge, sitting alone, determine[d] the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty." (Brackets sic.) *Ring* at 588. *Ring* declared this system unconstitutional, because the aggravating factors operated as " 'the functional equivalent of an element of a greater offense.' " *Id*. at 609, quoting *Apprendi* at 494, fn. 19. The Supreme Court explained that because the finding of an aggravating circumstance made a defendant eligible to receive the death penalty, the jury must also determine whether the state met its burden of proof as to that element. *Id*., *overruling Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).

**{¶ 58}** More recently, the Supreme Court applied *Apprendi* and *Ring* to invalidate Florida's capital-sentencing scheme in *Hurst v. Florida*, 577 U.S. ___, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016). The Florida law at issue in *Hurst* limited the jury's role in capital sentencing to making an advisory recommendation; a trial court was then free to impose a death sentence even if the jury recommended against it. *Id.* at 620. And even when a jury did recommend a death sentence, a trial court was not permitted to follow that recommendation until the *judge* found the existence of an aggravating circumstance. *Id.* at 620, 622. Thus, "Florida [did] not require the jury to make the critical findings necessary to impose the death penalty." *Id*. at 622. Instead, the trial judge in *Hurst* "increased [the defendant's] authorized punishment based on her own factfinding" when she sentenced him to death. *Id.* The Supreme Court held that Florida's capital-sentencing law, like the Arizona law in *Ring*, violated the Sixth Amendment. *Id.*

**{¶ 59}** Ohio's capital-sentencing scheme is unlike the laws at issue in *Ring* and *Hurst*. In Ohio, a capital case does not proceed to the sentencing phase until *after* the fact-finder has found a defendant guilty of one or more aggravating

circumstances. *See* R.C. 2929.03(D); R.C. 2929.04(B) and (C); *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 147. Because the determination of guilt of an aggravating circumstance renders the defendant eligible for a capital sentence, it is not possible to make a factual finding during the sentencing phase that will expose a defendant to greater punishment. Moreover, in Ohio, if a defendant is tried by a jury, then the judge cannot impose a sentence of death unless the jury has entered a unanimous verdict for a death sentence. R.C. 2929.03(D)(2).

{¶ 60} Federal and state courts have upheld laws similar to Ohio's, explaining that if a defendant has already been found to be death-penalty eligible, then subsequent weighing processes for sentencing purposes do not implicate *Apprendi* and *Ring*. Weighing is *not* a fact-finding process subject to the Sixth Amendment, because "[t]hese determinations cannot increase the potential punishment to which a defendant is exposed as a consequence of the eligibility determination." *State v. Gales*, 265 Neb. 598, 628, 658 N.W.2d 604 (2003); *see, e.g.*, *State v. Fry*, 138 N.M. 700, 718, 126 P.3d 516 (2005); *Ortiz v. State*, 869 A.2d 285, 303-305 (Del.2005); *Ritchie v. State*, 809 N.E.2d 258, 268 (Ind.2004). Instead, the weighing process amounts to "a complex moral judgment" about what penalty to impose upon a defendant who is already death-penalty eligible. *United States v. Runyon*, 707 F.3d 475, 515-516 (4th Cir.2013) (citing cases from other federal appeals courts).

{¶ 61} For these reasons, we hold that when a capital defendant in Ohio elects to waive his or her right to have a jury determine guilt, the Sixth Amendment does not guarantee the defendant a jury at the sentencing phase of trial.

### c. Additional challenges

{¶ 62} Belton's third proposition of law raises several additional constitutional challenges to Ohio's procedures for sentencing a capital defendant who enters a plea of guilty or no contest.

**{¶ 63}** First, he claims in his brief that Crim.R. 11(C)(3) is unconstitutional because it " 'needlessly penalizes the assertion of a constitutional right,' " quoting *United States v. Jackson*, 390 U.S. 570, 583, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968). Under Crim.R. 11(C)(3), if a defendant waives a jury trial and enters a guilty plea, a trial court may dismiss capital specifications "in the interests of justice." But there is no analogous rule governing cases that proceed to a jury trial. Belton claims that this different treatment impermissibly burdens capital defendants' exercise of their right to a trial by jury.

**{¶ 64}** We have previously considered and "rejected similar attacks on Crim.R. 11(C)(3)." *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 51, citing *State v. Dickerson*, 45 Ohio St.3d 206, 214, 543 N.E.2d 1250 (1989), and *State v. Buell*, 22 Ohio St.3d 124, 138, 489 N.E.2d 795 (1986). And Belton offers no explanation why the court should now reconsider those holdings.

**{¶ 65}** Second, Belton argues that Ohio's sentencing procedures for capital defendants who plead guilty violate *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), because they do not permit *a jury* to consider "substantial mitigating evidence, namely acceptance of responsibility through a plea of guilty."

**{¶ 66}** In *Lockett*, the United States Supreme Court invalidated Ohio's former death-penalty statute because it did "not permit the type of individualized consideration of mitigating factors * * * required by the Eighth and Fourteenth Amendment in capital cases." *Id.* at 606. But the Supreme Court did not hold, as Belton suggests, that states must permit a jury to consider any possible mitigating evidence at sentencing. Instead, the court indicated that states could not preclude "the *s*entencer" in a capital case from considering "*as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (Emphasis sic.) *Id.* at 604.

18

**{¶ 67}** Ohio's present sentencing law is consistent with *Lockett*. Evidence that a capital defendant accepted responsibility by entering a guilty plea is a relevant mitigating factor at sentencing. *Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, at ¶ 86. *See* R.C. 2929.04(B)(7). Belton is correct that a defendant who pleads guilty will never have an opportunity to present this type of mitigating evidence to a jury. However, the defendant can present that evidence to a three-judge panel. That panel will hear the defendant's mitigating evidence, weigh that evidence against the aggravating circumstances, and make an individualized sentencing determination, as required by R.C. 2929.03.

**{¶ 68}** Finally, Belton argues that "the denial of a right to jury sentencing after a plea of guilty violates a capitally charged defendant's rights to present a defense." The U.S. Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense," *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), meaning that they have a right to present relevant testimony and other evidence. *See State v. Swann*, 119 Ohio St.3d 552, 2008-Ohio-4837, 895 N.E.2d 821, ¶ 12-13. But a defendant is not deprived of his right to present a defense simply because he does not present his evidence to a jury. *See, e.g., State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 55-62 (rejecting a defendant's argument that a three-judge panel violated his right to present a complete defense). And Belton does not claim that he was prevented from presenting a full mitigation defense to the three-judge panel.

**{¶ 69}** For these reasons, proposition of law No. 3 fails.

### 3. Lethal-Injection Protocol

**{¶ 70}** In proposition of law No. 4, Belton argues that Ohio's lethal-injection protocol violates the Eighth Amendment's guarantee against cruel and unusual punishment.

**{¶ 71}** First, Belton questions "the training of the technicians performing the lethal injection procedure, the reliability of any back up procedures in the event

of any difficulty, such as an inability to locate a suitable vein for injection, and the efficacy of the single drug protocol." But to support these claims, Belton would have to rely on proof outside the record. Consequently, Belton's arguments are "not appropriately considered on a direct appeal." *State v. Madrigal*, 87 Ohio St.3d 378, 391, 721 N.E.2d 52 (2000) (because proof outside the record was needed to establish ineffective assistance of counsel, the claim was not appropriate on direct appeal).

{¶ 72} Second, Belton claims that Ohio law does not afford any state-court remedy for a protocol challenge, and he says that this alone *proves* that Ohio's lethal-injection protocol—and any other method of execution the state might use—violates multiple constitutional provisions. This argument turns entirely on Belton's reading of this court's decision in *Scott v. Houk*, 127 Ohio St.3d 317, 2010-Ohio-5805, 939 N.E.2d 835.

{¶ 73} *Scott* presented us with a certified question of law from a federal district court: "Is there a post-conviction or other forum to litigate the issue of whether Ohio's lethal injection protocol is constitutional under *Baze v. Rees*, 553 U.S. 35, 128 S.Ct. 1520, 170 L.E.2d 420 (2008), or under Ohio law?" *Scott* at ¶ 1. In response, we answered: "There is no state postconviction relief or other state-law mode of action to litigate the issue of whether a specific lethal-injection protocol is constitutional under *Baze* * * *, or under Ohio law." *Id.* at ¶ 4.

{¶ 74} In doing so, however, we noted that "review [is] available on this issue through Section 1983, Title 42, U.S.Code, for injunctive relief against appropriate officers or [through] federal habeas corpus petitions." *Id. Scott* also catalogued the established methods by which "an Ohio death-penalty defendant [can] receive state review of his or her case," *id*. at ¶ 2, and affirmed this court's prior holding that "these opportunities for review more than satisfy defendants' 'constitutional rights to due process and fair trials' while also protecting Ohio's

'inherent power to impose finality on its judgments,' " *id.* at ¶ 3, quoting *State v. Steffen*, 70 Ohio St.3d 399, 407, 412, 639 N.E.2d 67 (1994).

**{¶ 75}** In the wake of *Scott*, federal courts have struggled to define its holding. In Scott's own federal habeas proceedings, the United States Court of Appeals for the Sixth Circuit interpreted this court's decision in *Scott* as an "admission that Scott could not pursue [his lethal-injection] claim in any state forum." *Scott v. Houk*, 760 F.3d 497, 511 (6th Cir.2014), fn. 2. But in other decisions, the United States District Court for the Southern District of Ohio has concluded that *Scott* does not foreclose every possible avenue for raising a protocol challenge in Ohio courts. *See Gapen v. Bobby*, S.D.Ohio No. 3:08-cv-280, 2012 WL 3686303, *4 (Aug. 27, 2012) (report and recommendation by U.S. magistrate) ("*Scott* should not be read as narrowing the scope of any pre-existing Ohio procedures for raising a claim that all lethal injection executions are unconstitutional"), adopted in S.D.Ohio No. 3:08-cv-280, 2012 WL 4057406 (2012); *see also Hill v. Mitchell*, S.D.Ohio No. 1:98-cv-452, 2013 WL 1345831, *117-120 (Mar. 29, 2013), quoting *Scott*, 127 Ohio St.3d 317, 2010-Ohio-5805, 939 N.E.2d 835, ¶ 4 (" 'The Ohio General Assembly has not yet provided an *Ohio-law* cause of action for Ohio courts to process challenges to a lethal-injection protocol * * *' " [emphasis added]).

**{¶ 76}** We endorse the latter interpretation of *Scott.* In fact, in 2015, we accepted discretionary jurisdiction over a postconviction matter that squarely presents challenges to Ohio's lethal-injection protocol. *See State v. Broom*, __ Ohio St.3d __, 2016-Ohio-1028, __ N.E.3d __. Thus, we reject Belton's contention that prisoners have no avenue by which to pursue execution-protocol challenges in any state forum, which is the premise underlying his constitutional argument about *Scott*.

**{¶ 77}** Moreover, even if state-court review for a particular type of Eighth Amendment challenge were unavailable in Ohio, that would not, in itself, prove an

Eighth Amendment violation. The Eighth Amendment addresses two aspects of a criminal sentence: (1) it prohibits specific torturous methods of execution, *Gregg v. Georgia*, 428 U.S. 153, 169-170, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and (2) it requires proportionality between the crime and the punishment, *Miller v. Alabama*, __ U.S. ___, 132 S. Ct. 2455, 2463, 183 L.Ed.2d 407 (2012). A challenge to the adequacy of state-court judicial remedies implicates notions of due process, not the substantive protections of the Eighth Amendment. *See Scott*, 127 Ohio St.3d 317, 2010-Ohio-5805, 939 N.E.2d 835, at ¶ 3.

{¶ 78} We reject proposition of law No. 4.

### 4. Settled Issues

{¶ 79} Proposition of law Nos. 7, 8, and 13 present three constitutional claims that this court has squarely rejected.

{¶ 80} Belton asserts facial and as-applied constitutional challenges to Ohio's capital-punishment scheme and argues that the death-penalty statutes violate international law and treaties. And he urges the court to reconsider its holdings that (1) Ohio's definition of reasonable doubt is constitutional and (2) residual doubt is not a relevant factor at the mitigation phase. *See State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 173, 192. In his brief, Belton explains that he is making "a good faith effort to argue for a change in the law" and also seeking to preserve these issues for federal habeas review.

{¶ 81} We have rejected each of these claims in our prior decisions, and we now summarily reject these propositions of law. *See Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, at ¶ 279-280.

### B. Pretrial Issues

### 1. Pretrial Motions

{¶ 82} In proposition of law No. 5, Belton claims that the trial court undermined his right to a jury trial by denying pretrial motions that sought to protect

that right. According to Belton, the denial of seven motions left him with no choice other than to waive a jury and instead proceed before a three-judge panel.

**{¶ 83}** Capital defendants who waive their right to a jury and enter a guilty plea cannot challenge pretrial rulings on appeal; instead, they are limited to attacking the validity of the plea itself. *Tollett v. Henderson*, 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973) (explaining that "a guilty plea represents a break in the chain of events which has preceded it in the criminal process"). However, Ohio permits capital defendants who waive their right to a jury and enter a no-contest plea to challenge pretrial rulings. *See* Crim.R. 12(I) ("The plea of no contest does not preclude a defendant from asserting upon appeal that the trial court prejudicially erred in ruling on a pretrial motion, including a motion to suppress evidence").

**{¶ 84}** First, Belton challenges the trial court's denial of his motion to prohibit the prosecutor from using peremptory challenges to exclude potential jurors who expressed reservations about the death penalty. A prospective juror may be excused for cause if the juror's views on the death penalty "would prevent or substantially impair the performance of his duties." *State v. Rogers*, 17 Ohio St.3d 174, 478 N.E.2d 984 (1985), paragraph three of the syllabus; *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). However, even when a for-cause challenge is not warranted, the prosecutor may "use peremptories to eliminate jurors based on opposition to the death penalty." *State v. Murphy*, 91 Ohio St.3d 516, 529-530, 747 N.E.2d 765 (2001), citing *State v. Esparza*, 39 Ohio St.3d 8, 13-14, 529 N.E.2d 192 (1988). Accordingly, the trial court did not err by denying Belton's motion.

**{¶ 85}** Second, Belton asked the court to order a jury view of a maximum-security prison or, alternatively, to let him introduce a video showing conditions at such a facility. Belton contends that "a fact finder should be aware of the consequences and conditions associated with life incarceration" when he or she decides whether to impose the death penalty. Belton says the trial court's denial of

his motion eliminated "another potentially effective mitigating factor" that might have persuaded one or more jurors to impose a life sentence.

**{¶ 86}** Belton's argument fails because this is not admissible mitigation evidence. "[M]itigating factors are facts about the defendant's character, background, or record, or the circumstances of the offense, that may call for a penalty less than death." *State v. White*, 85 Ohio St.3d 433, 448, 709 N.E.2d 140 (1999); *see also Lockett*, 438 U.S. at 604, 98 S.Ct. 2954, 57 L.E.2d 973 (sentencer in a capital case cannot constitutionally be "precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record or any of the circumstances of the offense" [emphasis sic]). But for Eighth Amendment purposes, this definition does not include evidence of potential prison sentences (as an alternative to death), *White* at 448, or evidence about future conditions of confinement. *See State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 130 (explaining that such evidence is not mitigating, because it does "not relate to appellant, his background or the nature and circumstances of the crime"). Therefore, the evidence Belton wished to present was not relevant to the sentencing evaluation, and the trial court properly denied his motion.

**{¶ 87}** Next, Belton requested a jury instruction that the defense bears no burden at the mitigation phase. It is true that the prosecutor bears the burden to prove beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors. *State v. Stumpf*, 32 Ohio St.3d 95, 102, 512 N.E.2d 598 (1987). However, the defendant bears the burden to prove the existence of any mitigating factors by a preponderance of the evidence. *Id.* Accordingly, the trial court did not err by denying Belton's motion for a jury instruction that he bore *no* burden at the mitigation phase.

**{¶ 88}** Belton also requested a jury instruction about mercy as a mitigation factor. According to Belton, the trial court "removed one of the few potentially effective mitigating factors" available to him by denying this motion. But we have

long held that mercy is not a mitigating factor. *See State v. O'Neal*, 87 Ohio St.3d 402, 416, 721 N.E.2d 73 (2000); *State v. Lorraine*, 66 Ohio St.3d 414, 418, 613 N.E.2d 212 (1993) ("Mercy * * * is irrelevant to the duty of the jurors"). The trial court did not err by denying this motion.

{¶ 89} Next, Belton moved for leave to present the final argument at the mitigation phase. "During the sentencing phase of a capital trial the state, having the burden of proving that aggravating circumstances outweigh the mitigating factors, has the right to open and close arguments to the jury." *Rogers*, 17 Ohio St.3d 174, 478 N.E.2 984, at paragraph six of the syllabus. "[A]ny claim that the trial court erred in following the statutorily mandated order of proceedings must sustain a heavy burden to demonstrate the unfairness and prejudice of following that order." *State v. Bayless*, 48 Ohio St.2d 73, 357 N.E.2d 1035 (1976), paragraph three of the syllabus. Belton has not attempted to meet that burden here, nor can he. Accordingly, the trial court did not err by denying Belton's motion.

{¶ 90} Belton filed a motion in limine to limit the state's mitigation-phase argument to aggravating circumstances already proved during the guilt phase. Belton is correct that the prosecutor may not rely on aggravating circumstances during the mitigation phase that were not already proved during the first phase of a trial. However, the prosecution's mitigation-phase case is not strictly limited to evidence of those aggravating circumstances. For example, a prosecutor may also rely on evidence "relevant to the nature and circumstances of the aggravating circumstances * * * of which the defendant was found guilty" and "evidence rebutting the existence of any statutorily defined or other mitigating factors first asserted by the defendant." *State v. Gumm*, 73 Ohio St.3d 413, 653 N.E.2d 253 (1995), syllabus. Accordingly, the trial court properly denied Belton's motion.

{¶ 91} Finally, Belton filed a motion in limine to prohibit the prosecutor from referring to the nature and circumstances of the offense as a factor to consider in the mitigation phase unless and until Belton offered it. According to Belton, "Unless and

until Defendant utilizes the nature and circumstances of the offense as a mitigating factor, the State may not make reference to them nor may this Court instruct the jurors that the nature and circumstances of the offense may be mitigating factors."

{¶ 92} The trial court denied Belton's motion, noting that there are many ways to permissibly introduce nature-and-circumstances evidence and citing the state's representation that it had no intention to argue that the nature and circumstances of the crime were an aggravating factor. However, the trial court did not analyze whether a prosecutor may state that nature and circumstances are a factor to consider in the mitigation phase if the defense has not offered them as mitigating evidence.[5]  As we explained in *State v. DePew*, 38 Ohio St.3d 275, 289, 528 N.E.2d 542 (1988):

> R.C. 2929.04(B) and (C) deal with mitigation and were designed to enable *the defendant* to raise issues in mitigation and to facilitate his presentation thereof.  If the defendant chooses to refrain from raising some of or all of the factors available to him, those factors not raised may not be referred to or commented upon by the trial court or the prosecution. When the *purpose* of these sections is understood, it is clear that such comment is appropriate only with regard to those factors actually offered in mitigation by the defendant.

(Emphasis sic.)  In light of this body of law, the trial court should have granted Belton's motion in limine to prohibit references to "the nature and circumstances of

---

[5] However, the trial court did quote a passage from *DePew*, and it granted the defendant's motion to "prohibit the prosecutor from arguing and the court from giving instructions regarding statutory mitigating factors not raised by the defendant."

the offense *as a factor to be considered in mitigation* unless and until offered by defendant." (Emphasis added.)

**{¶ 93}** In sum, the trial court erred by denying one of the seven pretrial motions Belton cites in support of his claim that the trial court undermined his right to a jury trial. Ultimately, Belton is suggesting that this pretrial ruling rendered his jury waiver involuntary. But Belton executed a written waiver of his right to trial by jury, and such waivers are presumptively knowing, intelligent, and voluntary. *See State v. Bays*, 87 Ohio St.3d 15, 19, 716 N.E.2d 1126 (1999). In this case, we are not persuaded that the trial court's ruling on this single motion in limine is sufficient to overcome that presumption of voluntariness.

**{¶ 94}** For these reasons, we reject proposition of law No. 5.

### 2. Prosecutor's File

**{¶ 95}** In proposition of law No. 6, Belton contends that the trial court erred by denying his motion to have a copy of the prosecutor's complete file turned over to the court for review to determine whether it contained undisclosed exculpatory or impeachment evidence.

**{¶ 96}** Belton filed a pretrial motion seeking "an order directing that a complete copy of the prosecutor's file be made and turned over to the court for review and to be sealed for appellate review, if necessary." He argued that turning the file over to the court was a "necessary corollary to" the prosecution's disclosure obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The trial court denied the motion, explaining that it was not necessary for the court to review the file absent an allegation of noncompliance with discovery under Crim.R. 16.

**{¶ 97}** The trial court's analysis was correct. "We have consistently rejected the argument that a trial court must 'examine the prosecutor's file to determine the prosecutor's truthfulness or seal the prosecutor's file for purposes of

appellate review' on the basis of speculation that the prosecutor *may* have withheld exculpatory evidence." (Emphasis sic.) *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 64, quoting *Hanna,* 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, at ¶ 60.

{¶ 98} Belton's sixth proposition of law fails.

## C. Plea-Hearing Issues

### *1. Belton's Confessions*

{¶ 99} In proposition of law No. 9, Belton argues that the trial court should have granted his motions to suppress his confession because it was a product of "coercive police misconduct designed to overcome his free will."

{¶ 100} Review of a trial court's ruling on a motion to suppress is "a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. We accept the trial court's factual findings as long as they are supported by competent, credible evidence. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 100. However, we review de novo the application of the law to these facts. *Burnside* at ¶ 8.

### a. Factual background

{¶ 101} Police arrested Belton around 7:30 or 8:00 p.m. on August 13, 2008, and transported him to police headquarters, where he was placed in a holding cell. Detectives Clark and Quinn first interviewed Belton from 12:50 to 3:02 a.m. on August 14. Clark read Belton the *Miranda* warnings and gave him a written copy of his rights. Belton executed a written *Miranda* waiver, which was witnessed by Clark and Quinn.

{¶ 102} Belton's second interview began around 5:35 a.m. and lasted approximately 30 minutes. Belton was not Mirandized again. However, before the interview began, Clark reminded Belton that the same rights still applied. Belton indicated that he understood.

{¶ 103} Before trial, Belton moved to suppress his confessions. After briefing and a suppression hearing,[6] the trial court denied the motion. The trial court found that (1) under "the totality of the circumstances," Belton was properly Mirandized and knowingly, intelligently, and voluntarily waived his rights as to both interviews, (2) no evidence indicated that Belton was "under the influence of any medications, narcotics or alcohol or illicit drugs" at the time of his statements, and (3) the interrogations and the detectives' statements "were not such to overbear the defendant's will to resist and bring about the confessions."

{¶ 104} At the plea hearing, the state introduced Belton's statements over his continuing objection.

### b. Analysis

{¶ 105} Belton now argues that the trial court erred by admitting these statements for a single reason: they were coerced by police. According to Belton, the detectives "essentially promise[d] leniency" and implied that "confessing or not confessing would literally make the difference between life and death."

{¶ 106} Before police officers may question a suspect in a custodial setting, the Fifth Amendment requires them to warn the suspect that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479, 86 S.Ct. 1602, 16 L.Ed.2d 694. The suspect may then "knowingly and intelligently waive these rights and agree to answer questions or make a statement." *Id.* "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of

---

[6] At the hearing, the state introduced complete video recordings of both interviews and presented testimony from Detective Lenhardt, Sergeant Russell, and Detective Clark. Belton's attorney's argued, in part, that Belton had been under the influence when he waived his rights, so much of the suppression-hearing testimony focused on whether Belton was under the influence of drugs or alcohol during questioning, but Belton does not press that claim on appeal.

that waiver * * *." *North Carolina v. Butler*, 441 U.S. 369, 373, 60 L.Ed.2d 286, 99 S.Ct. 1755 (1979).

{¶ 107} If a defendant later challenges a confession as involuntary, the state must prove a knowing, intelligent, and voluntary waiver by a preponderance of evidence. *See Miranda* at 475; *Colorado v. Connelly*, 479 U.S. 157, 168-169, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). To determine whether a confession was involuntary, we "consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards,* 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, *death penalty vacated on other grounds*, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978). However, we will not conclude that a waiver was involuntary "*unless* there is evidence of police coercion, such as physical abuse, threats, or deprivation of food, medical treatment, or sleep." (Emphasis sic.) *Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, at ¶ 35; *see State v. Treesh*, 90 Ohio St.3d 460, 472, 739 N.E.2d 749 (2001) ("we need not assess the totality of the circumstances unless we find that the tactics used by the detectives were coercive").

{¶ 108} As an initial matter, other than the fact that Belton was in police custody, nothing about the circumstances of his interrogation was inherently coercive. Belton was 22 years old, had an 11th-grade education, and had prior experience with the criminal-justice system. *See State v. Smith*, 61 Ohio St.3d 284, 288, 574 N.E.2d 510 (1991) (similar facts supported a finding of voluntariness). He was offered beverages before and during his interviews and was permitted to smoke and to use the bathroom. Belton was able to get some sleep in a holding cell during the hours between his arrest and his first interrogation.

{¶ 109} According to Detective Clark, Belton "seemed fully alert," did not have trouble communicating, and responded appropriately to questions. And the

interviews themselves were not unduly onerous. The first interview lasted approximately two hours and ten minutes. Then, after a break of two and a half hours, during which Belton accompanied officers to recover the murder weapon, detectives questioned Belton a second time for about 30 minutes. The total time that elapsed between the beginning of the first interview and the conclusion of the second was less than six hours.

{¶ 110} Belton next contends that, in spite of his valid waiver, he was coerced to confess as a result of statements that Detectives Clark and Quinn made during the interviews. Throughout the questioning, the detectives pressed Belton about the veracity of his accounts. At times, they said that perhaps Belton was not a bad person and Dugan's death was an accident. Clark warned Belton that the penalty for aggravated murder is death or life imprisonment and expressed concern about what Belton's grandmother might hear on the news. The detectives also suggested that if Belton confessed, it might be his "saving grace" and that if he cooperated, they would have something to take to the prosecutor and the court might have mercy. In essence, Belton says the officers threatened him with a death sentence and implied that only a confession would save him.

{¶ 111} This court may find coercion when law-enforcement officers "persuad[e] or deceiv[e] the accused, with false promises or information, into relinquishing his rights and responding to questions." *Edwards*, 49 Ohio St.2d at 39, 358 N.E.2d 1051. However, "the presence of promises does not as a matter of law, render a confession involuntary." *Id.* at 41. Officers may discuss the advantages of telling the truth, advise suspects that cooperation will be considered, or even suggest that a court may be lenient with a truthful defendant. *Id.* And "[a]dmonitions to tell the truth are considered to be neither threats nor promises." *State v. Loza*, 71 Ohio St.3d 61, 67, 641 N.E.2d 1082 (1994); *see also State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 29. Finally, it is not unduly coercive for a law-enforcement officer to mention potential

punishments. *See State v. Western*, 2d Dist. Montgomery No. 26058, 2015-Ohio-627, ¶ 38; *compare State v. Robinson*, 9th Dist. Summit No. 16766, 1995 WL 9424, *4 ("While a correct statement of the law may not render a confession involuntary, a misstatement of the law may cause such a confession to be involuntary").

{¶ 112} Here, contrary to Belton's claims, the detectives did not promise leniency if he confessed or threaten death if he did not. Nor did they claim to have authority to decide how Belton would be charged. Instead, Detective Quinn clearly told Belton, "I ain't making you no promises." He indicated that the prosecutor would decide the appropriate charge, and the judge would decide the sentence.

{¶ 113} Under the circumstances, we hold that the trial court properly denied Belton's motion to suppress, and we reject proposition of law No. 9.

### *2. Fingerprint Evidence*

{¶ 114} In proposition of law No. 10, Belton claims that the trial court erred by admitting the fingerprint evidence collected from the Buick "by an incompetent witness" and admitted during the testimony of an incompetent expert witness. While we are hard pressed to see how this evidence prejudices Belton because the police found him in the Buick, we nevertheless address his proposition of law.

{¶ 115} Over defense objection, Detective Goetz testified as a fingerprint expert at the plea hearing. According to Goetz, Detective Schriefer collected a fingerprint from the driver's side rear door of the Buick while they were executing a search warrant. Goetz and Schriefer later compared the print to Belton's fingerprints and each independently concluded that they were a match. Then, together, they mapped ten points of similarity between the prints. Goetz opined, to a reasonable degree of scientific certainty, that the print on the car was Belton's.

{¶ 116} A trial court's ruling on evidentiary issues, including the admissibility of expert opinions, will not be reversed on appeal absent an abuse of discretion and proof of material prejudice. *See State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, ___ N.E.3d ___, ¶ 53; *Terry v. Caputo*, 115 Ohio St.3d 351,

2007-Ohio-5023, 875 N.E.2d 72, ¶ 16 ("Trial courts have broad discretion in determining the admissibility of expert testimony, subject to review for an abuse of discretion").

{¶ 117} To be admissible, expert testimony must satisfy all of the following criteria:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information.

Evid.R. 702. "[T]he trial judge has a special obligation to ensure that scientific testimony is not only relevant but reliable." *Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, at ¶ 139, citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

{¶ 118} Belton does not dispute that Goetz's testimony satisfies the first requirement. The collection of fingerprints and the comparison of those prints with known samples is a matter beyond the knowledge or experience possessed by a lay person. *See State v. Hartman*, 93 Ohio St.3d 274, 284, 754 N.E.2d 1150 (2001) ("expert testimony was necessary to make fingerprint comparisons").

{¶ 119} As to the second requirement, Belton claims that Goetz was not qualified as an expert. But Goetz has testified as a fingerprint expert more than 20 times in Lucas County. Moreover, Goetz testified that he has collected fingerprints "hundreds of times" and made thousands of fingerprint comparisons over the last

16 years. Goetz completed a 40-hour Federal Bureau of Investigation course on developing latent fingerprints and also studied fingerprint analysis as part of an 80-hour crime-scene course at BCI. Finally, Goetz testified that he has been a member of Ohio Identification Officers since 1996, and he has regularly attended that organization's annual training updates.

{¶ 120} In response to defense questioning, Goetz admitted that he probably had not attended any fingerprint training for three years. He also conceded that only one of his trainings involved either a written or a peer evaluation—the BCI crime-scene training, which he completed in 1996. Goetz indicated that he was not aware of any type of standards for the collection and comparison of fingerprints.

{¶ 121} These statements indicate some possible limitations on the breadth of Goetz's expertise, and are relevant in determining the weight and credibility of his testimony. However, the trial court did not abuse its discretion by concluding that Goetz had met Evid.R. 702(B)'s requirement of "specialized knowledge, skill, experience, training, or education" regarding fingerprint evidence. A witness "need not have complete knowledge of the field in question" to qualify as an expert; it is sufficient that the knowledge Goetz possessed about fingerprint analysis would "aid the trier of fact in performing its fact-finding function." *Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, at ¶ 148. Indeed, a witness can have expert status without having completed special education or receiving a certification. *Id.* Here, Goetz testified that he had received relevant training in fingerprint analysis and testified to his vast experience with both collecting and analyzing fingerprints and with testifying as a fingerprint expert. Under the circumstances, the trial court reasonably determined that the second prong of Evid.R. 702 was satisfied.

{¶ 122} Finally, to be admissible, Goetz's testimony had to be "based on reliable scientific, technical, or other specialized information." Evid.R. 702(C). In the past, this court has observed that "the reliability of fingerprint evidence is well

established." *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 93; *see also Davis* at ¶ 140. And numerous federal and state courts have reached the same conclusion, even in the face of recent efforts by defendants to "mount[] a frontal assault on the use of fingerprint evidence in litigation." *United States v. Herrera*, 704 F.3d 480, 484 (7th Cir.2013); *see also United States v. John*, 597 F.3d 263, 274 (5th Cir.2010); *People v. Rivas*, 238 Cal.App.4th 967, 975-976, 190 Cal.Rptr.3d 43 (3d Dist.2015). Belton offers no reason why we should now categorically reject fingerprint evidence as a permissible subject of expert testimony.

{¶ 123} For these reasons, the trial court did not err by permitting Goetz to testify as a fingerprint expert, and we reject proposition of law No. 10.

### 3. Prosecutorial Misconduct

{¶ 124} In proposition of law No. 11, Belton contends that the prosecutor committed misconduct by introducing evidence about the nature and circumstances of the crime that was not necessary to establish guilt at his plea hearing. Because Belton did not raise this objection before the trial court, we review this claim for plain error. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 154.

{¶ 125} When evaluating a prosecutorial-misconduct claim, the relevant question is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). To answer that question, we consider two factors: (1) whether the conduct was improper and (2) if so, whether it prejudicially affected the defendant's substantial rights. *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 243.

{¶ 126} Belton alleges that the prosecutor acted improperly by introducing Dugan's autopsy report and parts of the coroner's testimony. Specifically, Belton objects to Dr. Scala-Barnett's "graphic testimony * * * about the distance of the

gun from the victim, the injuries sustained by the victim, the length of time it took for him to expire and what he must have experienced during that time." He reasons that this evidence was both "overkill" and "unnecessary" given that he had entered a no-contest plea. *See* Crim.R. 11(B)(2) (a no-contest plea "is an admission of the truth of the facts alleged in the indictment"). He further claims that this was an improper attempt by the prosecutor to argue that the nature and circumstances of the crime were aggravating circumstances. *See State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 94 ("the state may not tell the decisionmaker that the nature and circumstances of the murder itself are the aggravating circumstances").

**{¶ 127}** As explained above, when a capital defendant enters a plea of guilty or no contest, a panel of three judges must "hear evidence" and "decid[e] whether the accused is *guilty* of aggravated murder beyond a reasonable doubt" before it can proceed to sentencing. (Emphasis sic.) *Post*, 32 Ohio St.3d at 393, 513 N.E.2d 754. A prosecutor is therefore required to present sufficient evidence at a plea hearing to prove both aggravated murder and the capital specifications. *See Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, at ¶ 93 (sufficiency challenges are permitted even when a capital defendant pleads guilty).

**{¶ 128}** Belton suggests that a prosecutor's ability to introduce evidence during a plea hearing is more restricted than it is during the guilt phase of other capital trials. But we apply the same evidentiary rules in both contexts. *See, e.g., id.* at ¶ 127-128. And the prosecutor is not, as Belton implies, limited to offering only "that quantum of evidence necessary to establish a factual basis for the plea so as to allow the fact-finder to make a determination of guilt." Instead, the prosecutor may offer any evidence that is relevant to an element of the charged offense and otherwise admissible. As always, "[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus.

{¶ 129} Here, it was not error, let alone plain error, for the prosecutor to introduce or the trial court to admit the evidence Belton identifies. Scala-Barnett's testimony that the fatal gunshot was fired at close range and about the location of the shooter was relevant to establishing Belton's intent to kill. *See Ketterer* at ¶ 128. Her testimony about Dugan's injuries was relevant to proving the facts and circumstances of the offense. *See id.* Finally, contrary to Belton's claims, Scala-Barnett did not speculate about Dugan's mental state in the moments preceding his death. *Cf. State v. Combs*, 62 Ohio St.3d 278, 283, 581 N.E.2d 1071 (1991) (describing comments about murder victims' thoughts as "gross speculation").

{¶ 130} For these reasons, because the prosecutor's conduct was not improper, we reject proposition of law No. 11.

### D. Ineffective Assistance of Counsel

{¶ 131} In proposition of law Nos. 1, 12, 16, 17, and 18, Belton argues that trial counsel provided constitutionally ineffective assistance.[7] *See* Sixth and Fourteenth Amendments to the United States Constitution; Ohio Constitution, Article 1, Section 10. For ease of analysis, we address Belton's claims out of order.

{¶ 132} To establish ineffective assistance of counsel, Belton must (1) show that counsel's performance "fell below an objective standard of reasonableness," as determined by "prevailing professional norms," *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and (2) demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id*. at 694. When performing a *Strickland* analysis, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

---

[7] Proposition of law No. 18, part (e), repeats the claims raised in proposition of law Nos. 1, 12, and 16.

### 1. Failing to Argue Entitlement to Sentence Other than Death

{¶ 133} Belton contends that trial counsel were ineffective because they did not argue that he was entitled to a sentence other than death under Ohio law. Belton claims that the General Assembly "effectively repealed Ohio's death penalty" when it amended R.C. 2929.11(A) in 2011. But as explained above, Ohio has not repealed the death penalty. Therefore, we cannot conclude that Belton's trial counsel were ineffective for failing to make this argument.

### 2. Jury Waiver

{¶ 134} Belton also argues that counsel were ineffective because they advised him to waive a jury trial. The fact that Belton "voluntarily waived his right to a jury does not establish ineffective assistance of counsel." *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 55. The state's evidence included video recordings of Belton's confession and the shooting itself. The latter depicts Dugan's cooperation during the robbery and Belton's proximity to Dugan when he shot him in the back of the head. Counsel may have reasonably concluded that a three-judge panel was less likely than a jury to be emotionally swayed by this evidence. Hence, it was not objectively unreasonable for counsel to advise Belton to waive a jury trial.

### 3. Objections During Plea Hearing

{¶ 135} Belton raises two ineffective-assistance claims about trial counsel's failure to raise objections during the plea hearing.

{¶ 136} First, he argues generally that trial counsel unjustifiably failed to raise objections and thus failed to preserve issues for appellate review. But Belton does not provide a single citation or identify any example of an issue that counsel failed to preserve. Because he failed to cite any example, Belton cannot satisfy either prong of *Strickland*. *See State v. Bey*, 85 Ohio St.3d 487, 504, 709 N.E.2d 484 (1999).

**{¶ 137}** Second, Belton specifically contends that trial counsel should have objected to the coroner's testimony about the nature and circumstances of the crime and Dugan's death. But as we explained above, the coroner's testimony was proper. Accordingly, counsel's performance was not ineffective in this regard.

### *4. Mitigation Preparation and Presentation*

**{¶ 138}** The remainder of Belton's ineffective-assistance claims pertain to trial counsel's mitigation-phase preparation and performance.

**{¶ 139}** First, Belton argues that trial counsel abandoned their duty to actively and zealously advocate on his behalf when they waived a mitigation-phase opening statement. *See Evitts v. Lucey*, 469 U.S. 387, 394, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) (counsel "must play the role of an active advocate"). But counsel's decision to waive opening or closing statements is generally viewed as a tactical one, even in a capital case. *See State v. Bradley*, 42 Ohio St.3d 136, 144, 538 N.E.2d 373 (1989). Here, the prosecutor had already waived his own opening statement and Belton's counsel decided to follow suit, jumping straight into a presentation of mitigating evidence. Belton cannot overcome the strong presumption that this was a reasonable strategic decision.

**{¶ 140}** Second, Belton argues that counsel should have had him evaluated by a neuropsychologist because Belton exhibited signs of antisocial-personality disorder. According to Belton, violent offenders who exhibit signs of antisocial-personality disorder "more often than not also exhibit signs of abnormal brain development," a mitigating factor.

**{¶ 141}** During the mitigation hearing, Dr. Bob Stinson, the defense psychologist, testified that he initially recommended neuroimaging and/or a neuropsychological examination for Belton. Stinson had identified "a number of risk factors and a number of behavioral indicators that [Belton] is experiencing neurological or neuropsychological impairment," including in utero exposure to drugs and possibly infection, a complicated birth, reported head injuries and

migraines, drug use, and impulsivity. In light of these indicators, Stinson opined that a neuropsychological evaluation "very well may have shown that there's brain impairment and it may have helped to explain how [Belton] got to his lot in life."

**{¶ 142}** Trial counsel secured funding for a neuropsychologist to determine whether it was necessary to image Belton's brain. But they did not hire the expert. Accordingly, for the purpose of his evaluation, Stinson "assumed" that Belton did not have a brain impairment. According to Stinson, he would have more strongly urged a neuropsychological evaluation if it had been obvious to him that [Belton] suffered from brain injury.

**{¶ 143}** Stinson's testimony indicates that a neuropsychological evaluation might have yielded useful mitigation evidence. But even so, Belton cannot establish that trial counsel were deficient for failing to pursue that course. The record indicates that counsel consulted with a neuropsychologist and ultimately decided not to pursue an evaluation. Counsel may have been concerned that the evaluation would yield negative results, thereby damaging Belton's case. Notably, even Stinson did not believe the indicators of potential brain impairment in Belton were sufficiently strong for him to insist on the evaluation.

**{¶ 144}** Under the circumstances, we presume that counsel's decision was strategic. And in any event, the record does not indicate what results a neuropsychological evaluation or brain scan would have yielded, so Belton cannot establish prejudice under *Strickland*.[8]

**{¶ 145}** Third, Belton argues that trial counsel should have secured a substance-abuse expert to testify about how drugs and alcohol affected his life. A defendant cannot establish ineffective assistance based on counsel's failure to

---

[8] Because Belton would need evidence outside the record to establish his claims that a neuropsychologist and a substance-abuse expert should have been called to testify, they are not appropriately raised on direct appeal. *See Madrigal*, 87 Ohio St.3d at 390-391, 721 N.E.2d 52 (it is not permissible to rely on evidence outside the record in a direct appeal). Belton could raise them on postconviction review.

secure an expert if counsel used "alternative devices" to "fulfill the same functions as the expert assistance sought." *State v. Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264 (1984), paragraph four of the syllabus; *see also Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, at ¶ 103. Here, trial counsel introduced significant evidence of Belton's history of drug and alcohol abuse—and how it may have affected him—through the testimony of Stinson, the defense psychologist. Belton offers no indication of how Stinson's testimony on the subject was inadequate. Because the record contains "no evidence * * * as to what a substance-abuse expert would have said in the penalty phase," Belton cannot "demonstrate[] prejudice from missing such testimony." *Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, at ¶ 111.

{¶ 146} Last, Belton contends that counsel should not have called Matthew Martin, a forensic counselor, as a witness during the mitigation phase. Belton argues that Martin's testimony was a "disaster" because he did not really know Belton, he was unprepared, and his testimony opened the door for the prosecutor to introduce evidence of Belton's altercations in jail.

{¶ 147} Martin testified that he is a forensic counselor on the maximum-security floor of the Lucas County Corrections Center, where Belton had been incarcerated for the last three years. Martin said that Belton was polite and followed the rules. For a time, Belton even held a special position, trustee, for which he was selected due to good behavior.

{¶ 148} Initially, Martin testified that Belton had been in only one physical altercation while on Martin's floor (when another inmate attacked him). However, on cross-examination, the prosecutor inquired about specific fights that occurred between 2008 and 2011. The prosecutor also presented Martin with a jail record from July 23, 2009, which described Belton as "a hard placement [because he] has had issues in each module on the fifth floor." Ultimately, Martin stated that to the

best of his knowledge, Belton's fights had occurred soon after his arrest; Martin did not recall Belton's initiating any fights in the last three years.

{¶ 149} "Generally, counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *Treesh*, 90 Ohio St.3d at 490, 739 N.E.2d 749. Here, Martin's testimony was consistent with the defense's mitigation argument that Belton's behavior in jail improved over time, as he adapted to the environment. And Belton's concern that Martin's testimony opened the door to questions about his jailhouse altercations does not make this strategy objectively unreasonable. *See State v. Nix*, 1st Dist. Hamilton No. C-030696, 2004-Ohio-5502, ¶ 60 ("it clearly cannot be said that defense counsel is constitutionally ineffective whenever he or she inadvertently opens the door to otherwise inadmissible testimony"). In fact, the state would have been able to introduce the same evidence in any event; the defense psychologist had testified about his review of Belton's jail records and even described some of his disciplinary charges. Counsel's performance was not deficient in this regard.

{¶ 150} For all these reasons, Belton's ineffective-assistance claims fail. We reject proposition of law Nos. 1, 12, 16, 17, and 18.

### E. Cumulative Error

{¶ 151} In proposition of law No. 20, Belton urges the court to reverse his conviction or, alternatively his sentence, on grounds of cumulative error.

{¶ 152} The cumulative-error doctrine provides that "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 223, citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus.

{¶ 153} Here, Belton cannot point to "multiple instances of harmless error." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). Nor does he explain

how the alleged errors collectively deprived him of a fair trial. Accordingly, proposition of law No. 20 fails.

## F. Independent Sentence Evaluation

{¶ 154} In proposition of law No. 19, Belton argues that his death sentence was inappropriate in light of the mitigating evidence presented. This claim dovetails with our obligation to independently review Belton's death sentence for appropriateness and proportionality. R.C. 2929.05(A).

{¶ 155} In conducting this review, we must determine whether the evidence supports the three-judge panel's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether Belton's death sentence is proportionate to those affirmed in similar cases. *Id.*

### 1. Aggravating Circumstance

{¶ 156} The three-judge panel found Belton guilty of two aggravating circumstances: committing murder to escape detection, R.C. 2929.04(A)(3), and, as the principal offender, committing murder in the course of an aggravated robbery, R.C. 2929.04(A)(7). The specifications were merged before sentencing, and the prosecutor elected to proceed with the (A)(7) specification.

{¶ 157} The evidence adduced at the plea hearing supports the panel's finding that Belton murdered Dugan in the course of an aggravated robbery and that Belton was the principal offender. Security-camera video from the BP carryout, recorded on the morning of August 13, 2008, shows a single armed individual confront Dugan with a gun, take money and other items, then shoot Dugan at close range. In addition, video recordings show Belton confessing both crimes to police on August 14, 2008. This evidence, coupled with other evidence adduced at the no-contest-plea hearing, indicates that Belton knowingly killed Dugan while committing aggravated robbery and that Belton was the principal offender in the crimes.

## 2. Mitigating Factors

{¶ 158} We must weigh the above aggravating circumstance against any mitigating evidence about "the nature and circumstances of the offense" and Belton's "history, character, and background." R.C. 29259.04(B). In addition, we must consider the statutory mitigating factors under R.C. 2929.04: (B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), (B)(3) (mental disease or defect), (B)(4) (youth), (B)(5) (lack of significant criminal history), (B)(6) (accomplice only), and (B)(7) (any other relevant factors).

### a. Belton's mitigation hearing

{¶ 159} The defense presented testimony from five witnesses at the mitigation phase: Belton's mother, Kim Harold; Belton's great-aunt, Linda Berry; a mitigation specialist, Mark Rooks; a psychologist, Dr. Bob Stinson; and a forensic counselor at the Lucas County Corrections Center, Matthew Martin. Belton also introduced 22 exhibits, including reports of Rooks's interviews with Belton's family members and Belton's educational, medical-history, and employment records. Belton did not testify or present an unsworn statement.

{¶ 160} On rebuttal, the state presented the testimony of Dr. David Connell, a clinical psychologist, and introduced records from the Lucas County Corrections Center.

### i. Background and family history

{¶ 161} Belton's mother, Kim Harold, was born to a teenage mother, Sheila Googins, in 1965. As a child, Kim moved frequently, living at times with her mother, her grandmother, and foster parents. When she was five or six, Kim moved in with her mother and stepfather, George Harold, who adopted her. George molested Kim for years, and at some point when Kim was a teenager, she told Sheila that George had molested her. Sheila told Kim she did not believe her, but then Sheila became depressed over the allegation and attempted suicide. Kim moved in with her grandmother after Sheila's suicide attempt. Kim became

depressed and began to use marijuana and crack, but she did complete high school and then attended a semester of a nursing program at the University of Toledo.

{¶ 162} At a young age, Kim entered an 11-year relationship with Anthony Belton Sr. They had two sons together when Kim was in her early twenties. Belton was born on November 23, 1985, and Aaron followed on January 5, 1987. Kim used drugs during both pregnancies—marijuana during the first and cocaine during the second. She was also hospitalized for an abdominal contusion during her pregnancy with Belton. Even so, records and family members indicate that Belton's birth was normal and that he was a full-term baby.

{¶ 163} As a young child, Belton saw his father infrequently. The family lived in Toledo, but Belton Sr. was stationed in Japan for four or five years as a member of the United States Marine Corps. When Belton was about four years old, Belton Sr. became frustrated with Kim's continued drug use, and he moved to California. Kim attempted suicide. But soon she began dating Belton Sr.'s nephew, Christopher Belton, and they had a son together. Christopher became like a surrogate father to Belton.

{¶ 164} Kim and her sons moved frequently, living in eight or nine homes while Belton was growing up. Belton attended school regularly, but he began to get into trouble at an early age. According to Belton's great-aunt, Belton knew the difference between right and wrong, but had a tendency not to listen. Kim disciplined him by spanking him or hitting him with a belt.

{¶ 165} Belton witnessed both domestic abuse and drug use in the home. On one occasion, police came to investigate a domestic-violence incident and Belton was maced by the police. Another time, Kim went to the hospital, where she reported that Christopher had assaulted and raped her. Kim smoked marijuana in front of her sons, at times used $100 worth of cocaine in a single day, and left home for days-long crack binges. Yet she rejected offers from Belton Sr. and her mother to take the boys.

{¶ 166} When Belton was around 11 years old, Kim was incarcerated for forgery and petty theft. Kim sent Belton and Aaron to live with Belton Sr. in California. Initially, Belton attended school and earned good grades. He got along well with his father's girlfriend, LaTisha. But after about a year, Belton Sr. and LaTisha broke up, and the family moved.

{¶ 167} When Belton was 13 or 14 years old, Belton Sr. began dating a woman named Michelle. Michelle and her three daughters moved into the house, and she expected Belton to help with the kids. She also tried to act as a surrogate mother to Belton, which he resented. According to Dr. Stinson, "By this time, [Belton] was an angry child who very much resented the abandonments that he had suffered up to this point in life."

{¶ 168} Belton Sr. employed military-style discipline with the boys and frequently grounded Belton or took away privileges. He ordered Belton to do physical exercises such as push-ups as punishment. Belton Sr. also sometimes ordered Belton to box with him so that Belton Sr. could show him that he was stronger and was in charge. At times, he made Belton sit in a hot car all day while he worked.

{¶ 169} Belton attended Gompers High School in San Diego, California, a school that Stinson testified was known for its "crime ridden, gang infested environment." Riots broke out at Gompers several times a year, and when fights broke out, teachers would contain the fighting by closing gates inside the school until a swat team arrived. Belton's attendance at school was spotty. He got into fights, was beaten up a few times, and ultimately joined a gang. Belton began using alcohol and marijuana, but he did not try cocaine or crack, because he had seen what those drugs did to his family members.

{¶ 170} When Belton was 17 or 18 years old, he assaulted a female classmate, and her family threatened charges. Belton Sr. decided to send his sons back to Toledo on a bus.

{¶ 171} Although Belton was glad to return to Toledo, he did not adjust well to the move; his great-aunt testified that he seemed depressed and angry. Initially, Belton enrolled in high school and got a job. But his school attendance was poor, and he was soon kicked out for fighting. Belton began pursuing a GED, but stopped attending classes. And he was fired from his job because he did not want to follow rules. Around this time, Belton began hanging out with his cousins, who used and dealt drugs.

{¶ 172} Belton lived with his mother and his Great-Aunt Sherry, but he left after he got into some disagreements with his great-aunt. Finally, Belton moved into the home of his maternal great-grandmother, Marianne Dodson. Dodson ran a "flop house" for anyone who needed a place to stay. Dodson's guests tended to spend their days smoking marijuana, instead of working or attending school.

{¶ 173} Belton's mother described him as intelligent, fun-loving, and not a bad person. She said that Belton loves to help people. And Belton's great-aunt stated that she has never seen Belton get violent.

### ii. Belton's mental health

{¶ 174} Belton's great-aunt, Linda Berry, is a psychiatric nurse. She saw Belton frequently as a child and remembers him as being quiet. At family events, he sat alone rather than playing with other children.

{¶ 175} According to Berry, Belton became severely depressed in 2003 when his uncle, George Harold, died in a motorcycle accident. George had been a father figure and a stabilizing force to Belton. After George's death, Berry said, Belton "wouldn't talk to anybody" and "isolated himself." Berry thinks Belton may have experienced hallucinations and shown other signs of psychosis at the time.

**{¶ 176}** Berry set up an appointment for Belton to be evaluated at Connecting Point in November 2005. He was diagnosed with dysthymic disorder, which is chronic, low-grade depression.[9] His file was closed in March 2006.

**{¶ 177}** Dr. Bob Stinson, a forensic psychologist, testified that he had met with Belton, administered the Woodcock-Johnson III achievement test, and interviewed Belton's mother, brother, cousin, and great-aunt. Stinson also reviewed discovery materials, the mitigation specialist's interview notes, and records collected by the mitigation specialist.

**{¶ 178}** Stinson analyzed Belton's life through the lens of a United States Department of Justice ("DOJ") model that identifies various risk factors that make a person more likely to engage in criminal behavior, as well as various protective factors that reduce the risk of such behavior. According to Stinson, virtually every risk factor identified by the DOJ model applies to Belton, meaning that he was "at high risk for developing a psychological disorder or drug dependence and criminal activity." Stinson testified that these risk factors provide "a context in which to understand how [Belton] developed morally, how he developed in terms of values and what influence[d] his choices that he ultimately made."

**{¶ 179}** Stinson conceded that Belton made a choice when he committed the crimes. However, he opined that Belton's background may reduce his moral culpability for his crimes. And Stinson testified that Belton has expressed sincere remorse for his actions.

**{¶ 180}** Stinson diagnosed Belton with an untreated bipolar disorder. In support, he cited Belton's reports of feeling alternately sad, energized, irritable, and suspicious of others. He also noted Belton's personal and family history of depression, his difficulty sleeping, and his report of hearing voices. The state's psychologist, Dr. Connell, disagreed with Stinson's diagnosis. Based on his review

---

[9] On rebuttal, the state's psychologist, Dr. Connell, noted that it was inappropriate for Connecting Point to attempt to diagnose Belton at the time, in light of his daily drug use.

of the records, Connell opined that the better diagnosis is antisocial-personality disorder.

{¶ 181} Stinson also diagnosed Belton with drug and alcohol dependence. Belton began using alcohol and marijuana at age 15. Belton told Stinson that by the time he was 17, he was a "minialcoholic." He told Stinson that he drank pints of liquor at a time and sometimes blacked out. At the time of his arrest, Belton was using at least one ounce of marijuana a day. At other times, he used as much as one and a half ounces daily. Stinson explained that individuals with untreated mental illness "oftentimes turn to drugs and alcohol" in an effort to self-medicate.

{¶ 182} Belton's full-scale IQ is 89. However, Stinson noted indications of possible brain damage, such as perinatal risk factors, reported head injuries, reported migraines, and other behavioral indicators. Stinson recommended, but did not insist, that defense counsel secure a neuropsychological or neurological evaluation of Belton. Because this evaluation did not occur, Stinson's conclusions are based on the assumption that Belton does not have brain damage.

### iii. Jailhouse behavior

{¶ 183} Matthew Martin, a forensic counselor on the maximum-security floor of the Lucas County Correctional Facility, testified about Belton's behavior in jail since his arrest. Belton had been on Martin's floor for three years, after initial placements on suicide watch and then another floor. According to Martin, Belton is polite and can exercise self-control.

{¶ 184} Martin testified that Belton hardly ever had discipline problems while on his floor. According to Martin, Belton had been selected as a trustee, a privilege reserved for well-behaved inmates. Martin explained that Belton was removed from that position only because a jail captain thought his case was too high profile.

{¶ 185} On rebuttal, the state introduced reports from the jail's disciplinary board dated from 2008 to 2011. The reports document Belton's attack on a special-

needs inmate, physical altercations with other inmates, disregard of instructions, and possession of contraband. In July 2009, Belton challenged a shift commander to a fight, stating, "I'm facing the death penalty. I ain't got nothing to lose." Personnel suspected Belton was trying to manipulate his placements in the jail, and one report indicated that Belton may be "a hard placement." Belton also made repeated requests for painkillers, which Dr. Connell described as suspicious, drug-seeking behavior.

{¶ 186} Dr. Stinson testified that Belton's prison record shows his potential to adjust to confinement. He explained that although Belton's record is imperfect, it shows improvement over time. Belton was cited in six disciplinary actions in 2009, three in 2010, and three in 2011. According to Stinson, prison is probably the most stable environment Belton has ever been in and he has responded well to the structure.

### b. Weight of mitigating factors

{¶ 187} Based on the above evidence, Belton asked the trial court to assign weight to the following mitigating factors: (1) his history and background, R.C. 2929.04(B), (2) his youth, R.C. 2929.04(B)(4), (3) his lack of significant criminal history, R.C. 2929.04(B)(5), and (4) other factors such as mental-health problems, remorse, acceptance of responsibility, and adaptability to a prison setting, R.C. 2929.04(B)(7). He concedes that there is nothing in the nature and circumstances of the offense that is mitigating.

{¶ 188} Upon our review of the record, we assign weight to the following mitigating factors. First, Belton presented significant evidence of his difficult childhood and upbringing. As a child, Belton moved frequently and had an unstable home life. His family had a history of depression, domestic violence, physical abuse, and drug and alcohol abuse. Belton's mother smoked marijuana in front of him and left home for days at a time to go on crack binges. When she was incarcerated, Belton went to live with his father in California, even though they had

not seen each other for years. Belton's father physically abused him. Belton attended a violent, crime-ridden high school, where gangs and riots were common. He eventually joined a gang himself and began using drugs. He did not finish high school, had trouble holding a job, and had difficulty following rules. We assign significant weight to Belton's family history and background.

{¶ 189} Second, Belton was 22 years old when he robbed the BP carryout and murdered Dugan. In the past, we have accorded some weight to the defendant's youth when considering defendants of a similar age. *See, e.g., Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, at ¶ 307 (23-year-old defendant); *State v. Goodwin*, 84 Ohio St.3d 331, 350, 703 N.E.2d 1251 (1999) (according "nominal weight" to defendant's age of 19). *Compare State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 262 (defendant's age of 25 "entitled to little, if any, weight"). Accordingly, we assign Belton's age some weight in mitigation.

{¶ 190} Third, the record does not indicate that Belton has a significant history of serious criminal convictions or delinquency adjudications. Belton's criminal record includes offenses such as loitering, disorderly conduct, giving false information to a police officer, failing to register a dog, and driving without a licensed driver while holding a temporary permit. We afford this factor some weight. *See State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 301.

{¶ 191} Fourth, the defense presented evidence that Belton suffered from mental-health problems. R.C. 2929.04(B)(7). Belton was diagnosed with dysthymia in 2005, and he may have been depressed for much longer. In addition, Dr. Stinson diagnosed Belton with bipolar disorder, as well as drug and alcohol dependence. And although the state's expert psychiatrist disagreed with Stinson's diagnosis of bipolar disorder, he opined that Belton suffers from antisocial-

personality disorder. This evidence of mental-health problems is entitled to some weight.

{¶ 192} Belton also argues that the record establishes his remorse for the crimes and his acceptance of responsibility. These claims are undermined by Belton's actions in the immediate aftermath of the murder (buying shoes and going to Burger King), his initial lies to police, and his statements to Christopher Wilson while they were in holding cells regarding Bolton's having told the police everything. However, Dr. Stinson and Belton's great-aunt both testified that Belton has repeatedly expressed remorse to them. And although Belton did not immediately accept responsibility for the crimes, he did help police locate the murder weapon, confess, and (much later) enter a plea of no contest to the charges against him. This factor is entitled to some weight.

{¶ 193} Finally, Belton asserts that he has established his adaptability to prison life. Although Belton was clearly not a model prisoner, there is some evidence that he began to cause fewer disciplinary problems as he spent more time in prison. Dr. Stinson explained that prison is probably the most stable environment Belton has ever lived in and opined that his behavior would only continue to improve. We assign minimal weight to this factor.

{¶ 194} At oral argument, Belton also asked us to consider one additional factor in our reweighing of his sentence: He asserts that the costs associated with a death sentence exceed the costs associated with a sentence of life imprisonment without parole. This "is not a legitimate mitigating factor." *State v. Davis*, 139 Ohio St.3d 122, 2014-Ohio-1615, 9 N.E.3d 1031, ¶ 114 (explaining that such costs are not relevant mitigating evidence because they are not evidence about the defendant's character or record or about the circumstances of the offense).

### 3. Weighing

{¶ 195} As detailed above, Belton has presented significant mitigating evidence that has substantial weight. That said, Belton shot Dugan at close range,

in the back of the head, even though Dugan had cooperated with Belton's demands for money and phone cards. Belton then left Dugan to die and went shoe shopping. Under the circumstances, we conclude that the aggravating circumstance in this case outweighs the mitigating factors beyond a reasonable doubt. *See State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 167 (compared with the serious aggravating circumstances of committing murder during the course of an aggravated robbery and aggravated burglary, Elmore's mitigating evidence had little significance).

### *4. Proportionality*

{¶ 196} The death penalty is appropriate and proportionate in this case, when compared to death sentences approved in similar cases. *See, e.g.*, *Murphy*, 91 Ohio St.3d 516, 747 N.E.2d 765 (shooting a robbery victim outside a bar); *Bey*, 85 Ohio St.3d 487, 709 N.E.2d 484 (stabbing a retail employee during a robbery); *State v. Eley*, 77 Ohio St.3d 174, 672 N.E.2d 640 (1996) (shooting a store clerk while robbing a market).

### III. CONCLUSION

{¶ 197} We reject each of Belton's propositions and affirm his convictions and sentence of death.

Judgment affirmed.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, LANZINGER, and FRENCH, JJ., concur.

O'NEILL, J., concurs in part and dissents in part for the reasons set forth in his dissenting opinion in *State v. Wogenstahl*, 134 Ohio St.3d 1437, 2013-Ohio-164, 981 N.E.2d 900.

_____

Julia R. Bates, Lucas County Prosecuting Attorney, and Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Spiros P. Cocoves and Jeffrey P. Nunnari, for appellant.

_____