[Cite as *State v. Windle*, 2017-Ohio-7813.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | Case No. 16CA1 |
| v. | : | |
| | | DECISION AND |
| TIMOTHY RAY WINDLE, | : | JUDGMENT ENTRY |
| Defendant-Appellant. | : | RELEASED 09/15/2017 |

APPEARANCES:

Timothy Young, Ohio Public Defender, and Valerie Kunze, Assistant Ohio Public Defender, Columbus, Ohio, for defendant-appellant.

Keller J. Blackburn, Athens County Prosecuting Attorney, and Merry M. Saunders, Athens County Assistant Prosecuting Attorney, Athens, Ohio, for plaintiff-appellee.

Hoover, J.

{¶1} Defendant-appellant, Timothy Ray Windle ("Windle"), was convicted of multiple crimes and sentenced to three years in prison following the entry of a no contest plea in the Athens County Court of Common Pleas. On appeal, Windle contends that his right to be free from unreasonable searches and seizures, pursuant to the Fourth and Fourteenth Amendments of the United States Constitution, was violated. Thus, he asserts the trial court erred when it overruled his motion to suppress evidence discovered when he was stopped and detained and his vehicle searched. Upon review, we find no merit to Windle's argument. Accordingly, we overrule Windle's sole assignment of error and affirm the judgment of the trial court.

**I. Facts and Procedural History**

{¶2}     Officer Joshua Braglin of the City of Nelsonville Police Department was on duty on July 30, 2013, when he entered the Go Mart gas station in Nelsonville, Ohio. Once inside of the store Jason Johnson, the store's shift manager, approached Officer Braglin. Johnson told Officer Braglin that there was an individual in a car in the parking lot that appeared to be unconscious. Although it was a sunny and hot day, the car's windshield wipers were on and the radio was playing loudly. Johnson asked Officer Braglin to conduct a well-being check and to "scoot" the individual along.

{¶3}     Officer Braglin called for back-up and verified from a distance that the individual was breathing. Once back-up arrived, the individual, later identified as Windle, was awakened by the officers and eventually ordered out of the vehicle. The officers then located a "stash can" and a hypodermic needle on Windle's person; and a search of Windle's vehicle yielded a baseball bat, a gun, several materials commonly used in the manufacture of methamphetamine, and methamphetamine residue.

{¶4}     On September 19, 2013, Windle was indicted by the Athens County Grand Jury for one count of illegal assembly or possession of chemicals for the manufacture of drugs within the vicinity of a juvenile, in violation of R.C. 2925.041(A), a felony of the second degree; one count of aggravated possession of drugs, in violation of R.C. 2925.11(A), a felony of the fifth degree; one count of having weapons while under disability, in violation of R.C. 2923.13(A)(4), a felony of the third degree; and one count of improperly handling a firearm in a motor vehicle, in violation of R.C. 2923.16(B), a felony of the fourth degree. The illegal assembly count also contained a firearm specification, as well as specifications for the forfeiture of the gun and automobile. At his arraignment, Windle entered a plea of not guilty.

{¶5} Windle eventually filed a motion to suppress, contending that any and all evidence be suppressed and excluded from trial because the charged offenses stemmed from an illegal and unconstitutional search and seizure. A hearing on the motion was held on June 12, 2014. Three witnesses testified at the hearing: Johnson, Officer Braglin, and Officer Mark Vancuren.

{¶6} Johnson testified that he was working at Go Mart on July 30, 2013, when he observed Windle inside of a red vehicle parked in the Go Mart parking lot. Johnson became concerned because Windle had been inside of the vehicle for over an hour, appeared to be "pale almost ashen, * * * diaphoretic, and did not look conscious"; and the store had a no loitering policy. Johnson testified that while it was a hot sunny day, the vehicle's windshield wipers were on and the radio was playing loudly.

{¶7} According to Johnson, shortly after he observed Windle, Officer Braglin entered the store; and he asked Officer Braglin to "check on him and scoot him along." Johnson explained that he had previously been a medic for 20 years and knew that the police would conduct well-checks. Johnson further testified that a youth baseball game or practice was taking place that evening at the baseball field immediately behind the Go Mart.

{¶8} Officer Braglin testified that he was on duty on July 30, 2013, when Johnson approached him at the Go Mart gas station. Officer Braglin testified that Johnson approached him in the store and told him he was concerned about an individual who had been inside of a red Mustang vehicle for over an hour in the store's parking lot. According to Officer Braglin, Johnson told him that the individual was sweating, was flushed, did not appear well, and that Johnson wanted him to leave because there were lots of children coming into and out of the store.

{¶9}    Officer Braglin testified that after he learned of the situation he immediately contacted Officer Mark Vancuren for back-up. While he was waiting for Officer Vancuren to arrive, Officer Braglin testified that he observed Windle from about a distance of 20 feet and verified that he was breathing. According to Officer Braglin, the radio was playing very loudly; Windle was "slouched over" in the driver's seat; and the windshield wipers were operating. Officer Braglin confirmed that there were "children everywhere" participating in either a baseball game or baseball practice, and that the gas station was also busy.

{¶10}   Officer Braglin testified that Officer Vancuren, and Trooper Calhoun of the Ohio State Highway Patrol arrived within minutes of his call for back-up. Officer Braglin stated that the officers met briefly away from Windle's vehicle to formulate a strategy on how to approach the vehicle together. Officer Braglin testified that he did not know what they were dealing with, and that he wanted to approach the vehicle in the safest way possible given the amount of people in the area. Ultimately, the officers decided to pull their cruisers up to the vehicle, with Officer Braglin and Trooper Calhoun approaching the driver's side of Windle's vehicle, and Officer Vancuren approaching the passenger side of the vehicle.

{¶11}   Officer Braglin testified that once the officers approached the vehicle, he and Trooper Calhoun glanced inside of the vehicle to check whether Windle had anything in his hands that could be harmful. Meanwhile, according to Officer Braglin's testimony, Officer Vancuren began to knock on the passenger side door to try and get Windle's attention. Officer Braglin stated that Officer Vancuren knocked several times and yelled a couple of times before finally getting Windle's attention. Even then, Windle "didn't really acknowledge" the officers' presence, and instead, Windle "started fumbling around, grabbing things in the console, cigarette packs, [and a] cigarette lighter".

{¶12} Officer Braglin further testified that for the "first probably three minutes" of the interaction, Windle seemed out of it, unable to comprehend the situation and what was being asked of him. Officer Braglin noted that Windle was "sweating profusely", had dilated pupils, appeared disoriented, and had broken speech. Officer Braglin testified that Windle was "[a]bsolutely not" able to drive the vehicle away and appeared to be under the influence of drugs or alcohol.

{¶13} Officer Braglin testified that Windle was eventually ordered out of the vehicle so that the officers "could check his overall safety and well being." Immediately, Officer Braglin noticed that Windle was wearing a jacket or sweater, which seemed odd given the high temperature that day. According to Officer Braglin, he also noticed a bulge in the jacket/sweater, which was concerning to him. Officer Braglin testified that Windle was asked whether he had anything on his person that the police needed to know about, and that Windle then reached into his right pocket and began to pull out an object, which Officer Braglin immediately recognized as a "stash can". Officer Braglin further testified that he saw a hypodermic needle hanging out of the stash can.

{¶14} Officer Braglin testified that immediately upon observing the needle and stash can he decided to arrest Windle for possession of drug abuse instruments. According to Officer Braglin's testimony, Windle was arrested and handcuffed near the driver's side door of the vehicle; and the stash can was retrieved and found to contain green residue, scales, a marijuana grinder, and a used needle. Officer Braglin then placed Windle into the rear of his patrol car. According to Officer Braglin, Windle was then read his *Miranda* rights, but was not questioned because "he kept nodding off and falling asleep in the back of the car." Officer Braglin testified that his intent was to impound Windle's vehicle because the store did not want it kept in their

parking lot. Windle was under arrest and was incapable of driving the vehicle. Windle did not identify anyone who could pick up the vehicle on his behalf.

{¶15}  According to Officer Braglin, the vehicle was then searched pursuant to the police department's policy that inventory searches be completed prior to vehicle impoundment. On cross-examination, Officer Braglin was confronted with his police report, which noted that the search was done incident to an arrest. Officer Braglin again stated that the search was done as an inventory search in accordance with department policy. Officer Braglin also testified that he noticed through the window what appeared to be a wooden baseball bat in the back floorboard of the vehicle that appeared to be "all scarred and ripped * * * like it had been beat on something other than baseballs." Officer Braglin stated that he was "concerned that it * * * could possibly been used as a weapon * * * so I wanted to take a look at it."

{¶16}  Ultimately, according to Officer Braglin, when he began searching the vehicle he quickly found the baseball bat and also Coleman fuel and tubing. Officer Braglin testified that in his experience, tubing and Coleman fuel are commonly used to produce methamphetamine. He further stated that upon finding the tubing and Coleman fuel he ordered everyone away from the vehicle, taped off the scene, and contacted an officer who is trained to deal with methamphetamine labs.  The search of the vehicle was then abruptly stopped until trained officers could arrive; and Windle was transported to the regional jail.

{¶17}  Officer Mark Vancuren of the City of Nelsonville Police Department testified that he arrived to the scene after a call for back-up to assist in a well-being check. Upon approach to the vehicle, Officer Vancuren noticed that Windle was slouched over to one side, appeared unconscious, and was sweating profusely. According to Vancuren, Windle was slow to respond; and he had to repeatedly yell and knock on the vehicle passenger window in order to get

Windle's attention. Once awakened, Windle appeared to be disoriented and did not immediately acknowledge the officers' presence, instead he began searching for a cigarette. Officer Vancuren also noticed that he was jittery and nervous, had glassy eyes and dilated pupils, and appeared to be "under the influence of something". Officer Vancuren testified that he ordered Windle out of the vehicle and noticed he was unsteady on his feet.

{¶18} Officer Vancuren testified that once Windle was out of the vehicle, he asked him if he had anything on his person. According to Officer Vancuren, Windle then reached into his pocket and pulled out a syringe. Officer Vancuren stated that Windle tried to put the syringe back into his pocket, but that he retrieved it from him. After retrieving the syringe, Officer Vancuren stated that Windle was placed under arrest. Officer Vancuren did not believe Windle was capable of safely operating the vehicle.

{¶19} The trial court filed a decision and entry on July 30, 2014, denying Windle's motion to suppress. The trial court determined that (1) the police had the right to initiate contact with Windle because it was lawful to check on his well-bing and because it was lawful to ask him to leave the premises, (2) the police had the right to remove Windle from his vehicle because "they acted appropriately within the bounds of the law and their actions did not violate any constitutional provisions", (3) there was "reasonable articulable suspicion at a minimum" that Windle was in violation of having physical control of a vehicle while under the influence of drugs or alcohol or of being intoxicated in public, thus justifying police contact and the order that he leave the vehicle, (4) the totality of the circumstances indicated that the length of the police detention was not unreasonable, and (5) the search of the vehicle was conducted lawfully because the officers had probable cause to believe that there would be additional items of contraband found in the vehicle.

{¶20}  Ultimately, Windle pleaded no contest to the indictment on October 13, 2015, in exchange for a jointly recommended sentence and dismissal of the firearm specification. The trial court accepted his no contest plea and found him guilty of all charges. For sentencing purposes, the trial court merged Counts Two, Three, and Four into Count One - the illegal assembly or possession of chemicals for the manufacture of drugs count. The trial court ordered Windle to serve a mandatory three-year term of incarceration, to be served consecutively to the prison term he was serving for a Hocking County conviction, and ordered that he pay a mandatory fine of $7,500.

## II. Assignment of Error

{¶21}  Windle assigns the following error for our review:

Assignment of Error I:

> The trial court erred in overruling Timothy Ray Windle's Motion to Suppress, in violation of the Fourth Amendment to the United States Constitution, and Article 1, Section 14, of the Ohio Constitution. (June 12, 2014 Transcript; June 30, 2014 Decision and Entry.).

## III. Law and Analysis

{¶22}  In his sole assignment of error, Windle contends that the trial court erred by denying his motion to suppress evidence. In particular, Windle argues that the trial court erred because he was unlawfully detained and because the search of his vehicle was also unlawful.

## A. Standard of Review

{¶23}  Appellate review of a trial court's ruling on a motion to suppress presents "a mixed question of law and fact." *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797

N.E.2d 71, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of the trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of the witnesses." *State v. Roberts,* 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 100, citing *State v. Mills,* 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). Consequently, in its review, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 100; *State v. Landrum,* 137 Ohio App.3d 718, 722, 739 N.E.2d 1159 (4th Dist.2000). However, an appellate court determines as a matter of law, without deferring to the trial court's conclusions, whether the trial court reached the correct legal conclusion in analyzing the facts of the case. *Belton* at ¶ 100; *Roberts* at ¶ 100; *Burnside* at ¶ 8.

### B. The Initial Contact was Lawful

{¶24}   Windle first contends that the trial court erred by denying his motion to suppress because the officers had no lawful reason to initiate contact with him. The State argues, on the other hand, that the officers' initial contact with Windle was lawful because they were conducting a well-being check.

{¶25}   " 'The Fourth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 14, prohibit unreasonable searches and seizures.' " *State v. Shrewsberry,* 4th Dist. Ross No. 13CA3402, 2014–Ohio–716, ¶ 14, quoting *State v. Emerson,* 134 Ohio St.3d 191, 2012–Ohio–5047, 981 N.E.2d 787, ¶ 15. Searches and seizures conducted without a prior finding of probable cause by a judge or magistrate are per se unreasonable under the Fourth Amendment, subject to only a few specifically established and well-delineated exceptions. *California v. Acevedo*, 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991); *State v. Tincher*, 47 Ohio App.3d 188, 190, 548 N.E.2d 251 (12th Dist.1988). "This

constitutional guarantee is protected by the exclusionary rule, which mandates the exclusion of the evidence obtained from the unreasonable search and seizure at trial." *Shrewsberry* at ¶ 14, citing *Emerson* at ¶ 15; *see also State v. Lemaster,* 4th Dist. Ross No. 11CA3236, 2012–Ohio–971, ¶ 8 ("If the government obtains evidence through actions that violate an accused's Fourth Amendment rights, that evidence must be excluded at trial.").

{¶26}   Nonetheless, "[n]ot every encounter between a citizen and a law enforcement official implicates the state and federal prohibition on unreasonable searches and seizures." *State v. Travis*, 4th Dist. Scioto No. 06CA3098, 2008-Ohio-1042, ¶ 9, citing *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *State v. Taylor*, 106 Ohio App.3d 741, 667 N.E.2d 60 (2d Dist.1995). "Police may lawfully initiate a consensual encounter without probable cause or a reasonable, articulable suspicion of criminal activity." *Id*. at ¶ 10, citing *United States v. Mendenhall*, 446 U.S. 544, 556, 100 S.Ct. 1870, 64 L.E.2d 497 (1980). "An encounter is consensual when an officer approaches a person in a public place, engages the person in conversation, requests information, and the person is free to not answer and walk away." *State v. Jones*, 4th Dist. Washington No. 11CA13, 2012-Ohio-1523, ¶ 9. " 'More pertinently, the mere approach and questioning of persons seated within parked vehicles does not constitute a seizure * * *,' i.e. it is a consensual encounter." *Id*., quoting *State v. Turley*, 4th Dist. Lawrence No. 96CA20, 1997 WL 111761, *2 (Mar. 6, 1997).

{¶27}   Based on the foregoing, we conclude in the case sub judice that the officers could lawfully approach Windle's parked vehicle and knock on the window to rouse him without any specific justification because such contact is a consensual encounter that does not implicate the Fourth Amendment.

{¶28}  As noted above, the State argues that it was justified in initiating contact with Windle so that it could conduct a well-check. As the Tenth District Court of Appeals has explained:

[P]olice officers are not required to possess reasonable suspicion of criminal activity when exercising community caretaking functions. *State v. Chapa,* 10th Dist. No. 04AP–66, 2004–Ohio–5070, ¶ 8, citing *State v. Norman,* 136 Ohio App.3d 46 (3d Dist.1999). "[C]ourts recognize that a community-caretaking/emergency-aid exception to the Fourth Amendment warrant requirement is necessary to allow police to respond to emergency situations where life or limb is in jeopardy." *State v. Dunn,* 131 Ohio St.3d 325, 2012–Ohio–1008, ¶ 21. Local police officers frequently investigate vehicle accidents where there is no claim of criminal liability to engage in community caretaking functions, "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Chapa* at ¶ 8, citing *Cady v. Dombrowski,* 413 U.S. 433 (1973). "Likewise, under appropriate circumstances, a law enforcement officer may be justified in approaching a vehicle to provide assistance without needing any reasonable basis to suspect criminal activity." *Id.* at ¶ 8, citing *Norman.* The bounds of an officer's ability to investigate, pursuant to the community caretaking function, are not limitless. A police officer must possess "objectively reasonable grounds to believe that there is an immediate need for his or her assistance to protect life or prevent serious injury to effect a community-caretaking/emergency-aid stop." *Dunn* at ¶ 26.

*State v. Weese*, 10th Dist. Franklin No. 12AP-949, 2013-Ohio-4056, ¶ 13.

{¶29}   Here, we conclude that the community caretaker exception does not apply. In particular, we note that the vehicle was lawfully parked; and Windle was visibly breathing. Moreover, the officers did not believe that immediate aid was necessary. Rather, upon learning of Windle and the vehicle, Officer Braglin called for back-up. Then when back-up arrived several minutes later the officers met away from Windle's vehicle and formulated a strategy on how to approach the vehicle. When asked at the suppression hearing why he waited to check on Windle's well-being, Officer Braglin responded that "I figure if he's sat there for over an hour already, a couple more minutes for my safety is not jeopardized." Given this record, we do not believe reasonable grounds existed to suggest that Windle was in immediate need of assistance in order to protect his life or to prevent serious injury. Accordingly, we find that the initial acts of the police were not justified under the community caretaker exception.

{¶30}   Nonetheless, the initial encounter did not run afoul of the Fourth Amendment, because as discussed above, the officers could lawfully approach Windle's parked vehicle and knock on the window to rouse him without any specific justification.

## C. The Police Had Valid Reasons to Prolong the Contact and to Ask Windle to Step Out of the Vehicle

{¶31}   Next, Windle contends that regardless of the legality of the initial contact, once it was determined that a medical emergency did not exist, the detention should have ceased. He argues that the continued detention was nothing more than a fishing expedition in search of contraband.

{¶32}   The investigative stop exception to the Fourth Amendment warrant requirement, often referred to as a *Terry* stop, allows an officer to briefly stop and temporarily detain individuals in order to investigate possible criminal activity. *State v. Staten*, 4th Dist. Athens No.

03CA1, 2003-Ohio-4592, ¶ 22, citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889

(1968). " 'To conduct an investigatory stop, the officer must be able to point to specific and

articulable facts which, taken together with rational inferences derived from those facts, give rise

to a reasonable suspicion that the individual is engaged or about to be engaged in criminal

activity.' " *State v. Eatmon,* 4th Dist. Scioto No. 12CA3498, 2013-Ohio-4812, ¶ 13*,* quoting

*State v. Kilbarger,* 4th Dist. Hocking No. 11CA23, 2012-Ohio-1521, ¶ 15. " 'The propriety of an

investigative stop by a police officer must be viewed in light of the totality of the surrounding

circumstances.' " *Id.,* quoting *State v. Freeman,* 64 Ohio St.2d 291, 414 N.E.2d 1044 (1980),

paragraph one of the syllabus.

{¶33} Moreover, "[a]n officer may expand the scope of the stop and may continue to

detain the vehicle without running afoul of the Fourth Amendment if the officer discovers further

facts which give rise to a reasonable suspicion that additional criminal activity is afoot." *State v.*

*Rose,* 4th Dist. Highland No. 06CA5, 2006–Ohio–5292, ¶ 17, citing *State v. Robinette,* 80 Ohio

St.3d 234, 240, 685 N.E.2d 762 (1997). "[I]f a law enforcement officer, during a valid

investigative stop, ascertains 'reasonably articulable facts giving rise to a suspicion of criminal

activity, the officer may then further detain and implement a more in-depth investigation of the

individual.' " *Id.* at ¶ 17, quoting *Robinette* at 241. During an investigatory stop, "[o]fficers can

order a driver and a passenger to exit the vehicle, even absent any additional suspicion of a

criminal violation." *State v. Alexander-Lindsey*, 2016-Ohio-3033, 65 N.E.3d 129, ¶ 14 (4th

Dist.).

{¶34} Furthermore, the totality of the circumstances approach "allows officers to draw

on their own experience and specialized training to make inferences from and deductions about

the cumulative information available to them that 'might well elude an untrained person.' "

*United States v. Arvizu,* 534 U.S. 266, 273*,* 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), quoting

*United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Thus, when a

court reviews an officer's reasonable suspicion determination, a court must give "due weight" to

factual inferences drawn by resident judges and local law enforcement officers. *Id.* at 273-274.

{¶35} Here, with the above principles in mind, we conclude that the continued detention

of Windle was justified because of the existence of various factors giving rise to a reasonable

suspicion that additional criminal activity was afoot. Notably, Windle was disoriented, jittery,

nervous, had dilated pupils, glassy eyes, appeared to be under the influence of drugs or alcohol,

had broken speech, and at times was unresponsive. When ordered out of the car, the officers also

noticed that Windle was unsteady on his feet, was wearing a sweater on a hot summer day, and

that a bulge was protruding from the sweater. These factors coupled with the unusual manner in

which Windle was found – slouched over, unconscious in a car, with wipers running and music

playing loudly - gave the officers reasonable cause to investigate whether Windle may have been

involved in further criminal activity. Officer Braglin and Officer Vancuren were thus entitled to

detain Windle and to inquire further until they confirmed or dispelled their suspicions.

Accordingly, Windle's argument that the nature of the stop and detention unlawfully transformed

into a fishing expedition is without merit.

### D. The Officers Had Probable Cause to Search the Vehicle

{¶36} Finally, the officers possessed probable cause to conduct a search of Windle's

vehicle. Under the "automobile exception" to the warrant requirement, police officers may

perform a warrantless search of a vehicle so long as they have probable cause to believe the

vehicle contains contraband or evidence of a crime. *State v. Chaffins,* 4th Dist. Scioto No.

13CA3559, 2014–Ohio–1969, ¶ 18; *State v. Williams,* 4th Dist. Highland No. 12CA7, 2013–

Ohio–594, ¶ 25. " 'Probable cause exists when there is a "fair probability that contraband or evidence of a crime will be found in a particular place." ' " *State v. Bostwick,* 4th Dist. Scioto No. 10CA3382, 2011–Ohio–3671, ¶ 25, quoting *State v. Evans,* 2d Dist. Montgomery No. 20794, 2006–Ohio–1425, ¶ 33, quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

{¶37} Here, the record evidence establishes that the officers had probable cause to search the vehicle. Windle was found inside of the vehicle and it appeared that he was under the immediate influence of drugs or alcohol. Moreover, as discussed above, Windle was nervous, jittery, and often unresponsive when interacting with the police. It was also determined that Windle had a used hypodermic needle on his person, as well as other drug abuse instruments. Finally, Officer Braglin testified that he could see in open view a baseball bat inside of the vehicle that looked like it had been used as a weapon. These facts all gave rise to the probable cause determination that the vehicle likely contained contraband or evidence of a crime. Finally, while Officer Braglin testified at the suppression hearing that he conducted an inventory search of the vehicle, and while his police report indicated he performed a search incident to arrest, we note that Officer Braglin is not a judge or lawyer qualified to make such a determination. "A police officer's subjective intentions play no role in analysis of investigative stops or probable cause Fourth Amendment analysis." *Staten*, 2003-Ohio-4592, at ¶ 19, citing *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *In re Nesser,* 4th Dist. Ross No. 00CA2551, 2000 WL 33226180 (Dec. 1, 2000); *State v. Thompson*, 4th Dist. Athens No. 96CA1748, 1997 WL 120212 (Mar. 12, 1997).

{¶38} In sum, we conclude that probable cause existed to search the vehicle, thus justifying the warrantless search under the automobile exception.

## IV. Conclusion

{¶39}  Because neither the initial contact, follow-up detention, nor search of Windle's vehicle violated the Fourth Amendment, we conclude that the trial court did not err in overruling Windle's motion to suppress evidence. Accordingly, Windle's sole assignment of error is overruled and the judgment of the trial court is affirmed.

JUDGMENT AFFIRMED.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED. Appellant shall pay the costs.

The Court finds that reasonable grounds existed for this appeal.

It is ordered that a special mandate issue out of this Court directing the Athens County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Harsha, J. & McFarland, J.: Concur in Judgment and Opinion.


                                        For the Court


                                        By: _____
                                             Marie Hoover, Judge




                              **NOTICE TO COUNSEL**


**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**